# NO. 23-1163

In The

# United States Court of Appeals
## For the Fourth Circuit

---

**PARKER O'NEIL WIDEMAN; RILEY C. DRAPER;
WILLIAM F. DOUGLASS; JESSICA L. DOUGLASS**

*Plaintiffs – Appellants,*

v.

**INNOVATIVE FIBERS LLC; STEIN FIBERS LTD**

*Defendants – Appellees.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT SPARTANBURG**

---

**BRIEF OF APPELLANTS**

---

Bert G. Utsey, III
Samuel R. Clawson, Jr.
Christina Rae Fargnoli
CLAWSON FARGNOLI UTSEY, LLC
2 Amherst Street
Charleston, SC 29403
(843) 970-2700
bert@cfulaw.com
sam@cfulaw.com
christy@cfulaw.com

Charles T. Slaughter
MORGAN LITIGATION GROUP, LLC
135 East Main Street
Lexington, SC 29072
(803) 359-6194
chuck@morganlitigation.com

**Attorneys for Appellants**

**Patrick H. Allan**
**LEE LAW OFFICES**
**P.O. Box 2229**
**Spartanburg, SC 29304**
**(864) 978-9519**
**pallan@leelawoffices.org**

**Attorneys for Appellants Riley C. Draper,**
**William F. Douglass, and Jessica L. Douglass**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................. ii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES ..........................................................2

STATEMENT OF THE CASE .............................................................2

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT ...................................................................................19

   1.   <u>Standard of Review</u> ................................................................19

   2.   <u>The Statutory Employment Doctrine</u> .......................................20

   3.   <u>AEO's Work for Innovative Fibers</u> ..........................................35

   4.   <u>Innovative Fibers' Trade, Business, or Occupation</u> .................40

   5.   <u>Injured Workers Were Performing Work that Innovative Fibers
       Outsourced to AEO</u> ................................................................47

CONCLUSION .................................................................................49

CERTIFICATE OF COMPLIANCE ...................................................51

TABLE OF AUTHORITIES

<u>CASES</u>

*Abbott v. The Limited,*
338 S.C. 161, 526 S.E.2d 513 (2000) ................................................................ 35

*Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Baltimore,*
855 F.3d 247, 251 (4th Cir. 2017)............................................................ 21

*Ballenger v. Bowen,*
313 S.C. 476, 443 S.E.2d 379 (1994) ................................................................ 23

*Bilheimer v. Federal Exp. Corp. Long Term Disability Plan,*
605 Fed. Appx. 172 (4th Cir. 2015) ........................................................ 33

*Bridges v. Wyandotte Worsted Co.,*
243 S.C. 1, 132 S.E.2d 18 (1963) .................................. 23, 24, 29, 30, 31, 32, 34

*Carter v. Florentine Corp.,*
310 S.C. 228, 423 S.E.2d 112 (1992) ................................................................ 23

*Edens v. Bellini*,
359 S.C. 433, 597 S.E.2d 863 (Ct. App. 2004) ........................................ 30, 31, 34

*Erie R. Co. v. Tompkins*,
304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ................................................ 21

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.,*
166 F.3d 642, 647 (4th Cir. 1999) ........................................................ 21

*Glass v. Dow Chem. Co.,*
325 S.C. 198, 482 S.E.2d 49 (1997) ........................................................ 34, 35, 41

*Harrell v. Pineland Plantation,*
337 S.C. 313, 523 S.E.2d 766 (1999) .................................... 23, 24, 37, 46, 49, 50

*Keene v. CNA Holdings,*
436 S.C. 1, 870 S.E.2d 156 (2021) .................................. 24, 25, 26, 27, 28, 29, 30,
31, 32, 33, 34, 35, 36, 42, 44, 45, 46

*Machin v. Carus Corp.,*
419 S.C. 427, 799 S.E.2d 468 (2017) ................................................................. 22

*Poch v. Bayshore Concrete Products/S.C.,*
405 S.C. 359, 747 S.E.2d 757 (2013) ....................................................... 29, 30, 31

*Provau v. YRC, Inc.,*
2017 WL 1541880, 2017 U.S. Dist. LEXIS 64580 (D.S.C. Apr. 28, 2017) .. 45, 46

*Olmstead v. Shakespeare,*
354 S.C. 421, 581 S.E.2d 483 (2003) ...........................................................27, 35

*Sandoval v. Apfel,*
86 F. Supp. 2d 601, (N.D. Tex. 2000) ..................................................................33

*Sourcecorp BPS, Inc. v. Kenwood Records Mgmt.,*
548 F. Supp. 2d 673 (S.D. Iowa 2008) ................................................................ 33

*Stahle v. CTS Corp.,*
817 F.3d 96, 100 (4th Cir. 2016 ......................................................................... 21

*Wilson v. Daniel Int'l Corp.,*
260 S.C. 548, 197 S.E.2d 686 (1973) ................................... 24, 29, 31, 32, 34, 46

*Zeigler v. Eastman Chem. Co.,*
54 F.4th 187, 194 (4th Cir. 2022) .......................................................... 21, 31, 32

## STATUTES

28 U.S.C. § 1291 ................................................................................................. 1

28 U.S.C. § 1332 ................................................................................................. 1

S.C. CODE ANN. § 42-1-400 (Repl. Vol. 2015) ....................... 22, 23, 25, 26, 27, 28

S.C. CODE ANN. § 42-1-540 (Repl. Vol. 2015) ...................................… 21, 22

S.C. CODE ANN. § 42-1-560 (Repl. Vol. 2015) ..................................... 22

## <u>OTHER AUTHORITIES</u>

Fed. R. App. P. 4 ..................................................................... 1

Fed. R. Civ. P. 12 .................................................................. 21

NEW OXFORD AMERICAN DICTIONARY 1246 (3d Ed. 2010) ................................. 33

Dictionary.com. Dictionary.com Unabridged (v 1.1).
Random House, Inc. http://dictionary.reference.com/browse/outsourcing
(accessed: April 23, 2008) ...................................................... 33

 Investopedia.com. Investopedia Inc.
 http://www.investopedia.com/terms/o/outsourcing.asp
(accessed: April 23, 2008) .................................................... 33

# JURISDICTIONAL STATEMENT

Appellants commenced these three actions in the Court of Common Pleas for Spartanburg County, South Carolina. (JA0043, JA0050, JA0058). Appellees removed Appellants' actions to the United States District Court for the District of South Carolina. (JA0003, JA0017, JA0032).

The district court had jurisdiction under 28 U.S.C. § 1332(a). Each Appellant is a citizen of the State of South Carolina. (JA0043, JA0050, JA0058). Appellee Innovative Fibers, LLC is a limited liability company whose members reside in the State of New York. (JA0067). Appellee Stein Fibers, Ltd. is incorporated in and maintains its principal place of business in the State of New York. (JA0068). The amount in controversy in each action exceeds $75,000.00, exclusive of interest and costs.

On December 16, 2022, the district court entered an Order (JA1064) which granted Appellees' Motions to Dismiss for Lack of Jurisdiction Pursuant to the Statutory Employment and the South Carolina Workers' Compensation Bar. This final order disposed of all of Appellants' claims. On February 14, 2023, Appellants appealed from that Order.[1] This Court has jurisdiction under 28 U.S.C. § 1291.

By Order dated February 16, 2023, this Court consolidated the appeals.

---

[1] In response to Appellants' requests pursuant to Fed. R. App. P. 4(a)(5), the district court extended the deadline to appeal until February 14, 2023. (JA0013).

## STATEMENT OF THE ISSUES

1. What was the work that Appellees subcontracted the injured workers' direct employer to perform at the Innovative Fibers plant?

2. Was this work part of Appellees' trade, occupation, or business?

3. Did the district court err in ruling that Appellees are entitled to the protection of the exclusive remedy provisions of the South Carolina Workers' Compensation Act via the statutory employment doctrine?

## STATEMENT OF THE CASE

1. Facts relevant to the issues submitted for review.

This action[2] relates to claims for catastrophic personal injuries by Appellants Parker O'Neil Wideman, Riley C. Draper, and William F. Douglass (collectively, "Injured Workers") and a claim for loss of consortium by Appellant Jessica L. Douglass resulting from an explosion at Innovative Fibers' Spartanburg, South Carolina, plant on November 1, 2021.[3]

---

[2] This appeal is from three district court cases. All three arose out of the same occurrence. The district court considered and ruled upon the cases in a joint fashion. This Court has consolidated the three cases for appeal. Therefore, for the sake of simplicity, Appellants refer to this as one case unless the context requires otherwise.

[3] Appellants allege Appellees "either independently or jointly owned, operated, controlled, maintained and managed" the Innovative Fibers plant (JA0044, JA0051, JA0059) and are each liable for the explosion that caused the Injured Workers' injuries. Given these allegations and the fact that the statutory employment issues are the same with respect to both Appellees, Appellants simply refer to Appellees collectively as "Innovative Fibers" when discussing the operative facts.

Innovative Fibers had a problem with Polyethylene Terephthalate ("PET") dust – waste generated by its manufacturing process – tons of which had built up on platforms and other structures above large crystallizer ovens in its plant. The waste accumulated because Innovative Fibers' employees did not clean those areas or remove the waste during normal plant operations. This became a problem for Innovative Fibers because it faced a steep increase in insurance premiums if it failed to eradicate the accumulation above the ovens. However, its employees did not have the ability to clean or to remove dust from the area above the ovens while manufacturing operations continued.

Thus, in an effort to avoid increased insurance costs, Innovative Fibers outsourced the task of cleaning up and removing PET dust from the area above the ovens. It engaged an independent contractor, Advanced Environmental Options ("AEO"), to provide labor and equipment to clean that area and to remove the waste without shutting down manufacturing operations. Injured Workers were AEO's employees. The explosion occurred while they were performing the work for which AEO was hired.

Innovative Fibers is in the business of manufacturing polyester staple fibers which are used in a wide range of industrial applications. (JA0321). Stein Fibers purchases all of the textile materials manufactured by Innovative Fibers. (JA0321, JA0332).

The South Carolina Occupational Safety and Health Administration ("SC OSHA") investigated the subject explosion. In its report, it summarized the plant's manufacturing process as follows:

> Raw materials are received from companies with waste materials, then ground to small sizes. In the loading area the material is processed and blown upstairs to crystallization ovens (170 degrees C), then moved to dryers which heat to 200 Degrees C. The resulting plastic is then sent to extruders, melted, and sent through a die head, ending up with about a fiber the width of a human hair. The creel machine then stretches the fiber which goes to setting ovens that crimp the material based on specifications of customers.

(JA 0388).

Innovative Fibers installed the two crystallization ovens in June of 2020. (JA0400, JA0495, JA0591). Those ovens (known as the "H Line" and "J Line") are located in an area of the plant referred to as the crystallizer room, a four-story room comprised of several distinct levels above the room's floor. (JA0494, JA0563, JA0841, JA0843). Level A refers to the platform on which the ovens are situated. Level B refers to the top of the ovens. Level C refers to a platform approximately 24" above the top of the ovens. Level D refers to the uppermost platform in the room, approximately 88" above the ovens, upon which a supertanker is located. There are various pipes, rails, purlins, and beams on levels C and D, which are sometimes referred to as "superstructure." Levels A through D are oriented vertically and, in combination, are sometimes referred to as the "tower." (JA0389, JA0407-0408, JA0571, JA0613-0614, JA0841, JA0843). The platforms on which the ovens sit

provide access for maintenance, whereas the platforms above the ovens secure hoppers to feed raw material into the ovens. (JA0389).[4]

As a result of the fiber manufacturing process, raw materials fall onto the first and second levels of the room, the floor below and the platforms around the ovens. Some PET dust gets mixed into this raw material as well. As part of their normal job responsibilities, Innovative Fibers' production and maintenance employees[5] would perform "housekeeping" on these levels by sweeping up the raw material and dust mixture, shoveling it into boxes, and then typically returning it to the production line for processing into product. This work was done to maximize the use of raw materials, to maintain a clear work area for employees, and to prevent interference with the operation of machinery. (JA0337-0338, JA0345-0346, JA0403-0404, JA0530-0533, JA0592-0593, JA0732-0733, JA0907).

In addition, the manufacturing process generated PET dust that gathered on top of the ovens (level B). Innovative Fibers' employees cleaned the interiors of the ovens weekly and sometimes removed dust from the tops of the ovens. This work was done to ensure proper operation of the ovens and to avoid overheating dust on

---

[4] In the record, the levels above the ovens are sometimes referred to simply as the "third level." (JA0407-0408).

[5] Innovative Fibers did not have a dedicated cleaning workforce at its plant. (JA0337-0339, JA0497, JA0566).

the ovens, which could affect the ovens' operation and/or cause a hazard. (JA0405, JA0462, JA0503-0504, JA0596).

PET dust also accumulated on the third and fourth levels of the crystallizer room – structures above the tops of the ovens. This accumulation did not affect the operation of the ovens or the work areas related thereto. The dust was purely waste and could not be reused as a raw material. (JA0485). Innovative Fibers' employees did not perform routine cleaning or dust removal in these areas; in fact, there was no set cleaning schedule for the crystallizer room and Innovative Fibers had no written policies for the cleaning of dust in that room. (JA0405, JA0410, JA0501, JA0566).

The evidence is conflicting as to whether Innovative Fibers' employees had ever cleaned or removed dust from the levels above the ovens (uppermost platforms, superstructure, levels 3 and 4, or levels C and D) and, if so, how many times. Either these employees did not or, at best, they did so on one or two occasions when the plant's manufacturing process (including the ovens) was shut down for semi-annual maintenance. (JA0405-0407, JA0438, JA0482-0484, JA0534-0539, JA0544-0546, JA0554-0558). It is undisputed that PET dust piled up on the third and fourth levels to the point that it presented both a potential safety hazard and a potential financial detriment to Innovative Fibers. The accumulation of dust in the levels above the ovens was so extensive that it suggested any cleaning by the Innovative Fibers' employees was minimal. (JA0705-0706). The dust accumulated because Innovative

Fibers either had not cleaned those areas or, even if it had, the cleaning efforts were inadequate. Innovative Fibers had to do something.

Before the explosion, Innovative Fibers' management and its consultants acknowledged an urgent need to bring in outside help to clean the levels above the ovens and to remove the large PET dust buildup.



Similarly, on October 25, 2021, Appellees' insurance brokerage firm emailed Innovative Fibers' management a copy of Hartford Insurance Company's updated "Important Recommendations" that advised the following regarding combustible dust cleaning:

> Develop a procedure and schedule for cleaning the dust in your facility. Accumulations of dust in your facility can create an explosion potential as this dust can become airborne creating hazardous clouds. This is especially true on higher surfaces such as ductwork and roof structures. Dust should never

be blown for cleaning purpose [sic], it should only be vacuumed using a vacuum cleaner rated for use with combustible dusts (Class II rated).

Engaging an outside firm to have a complete vacuum of all the dust once a month throughout the facility. IN [sic] the event there is a large build up in between the month, the contractor will be called back in.

(JA0654) (red emphasis in original).



In fact, Innovative Fibers had used an outside contractor to address waste accumulation issues at the plant beginning in June 2020, when the crystallization ovens were first installed.

[REDACTED] Among other things, Innovative Fibers requested that VLS clean the dust accumulations on the floor of the crystallizer room and in the areas above the crystallizer ovens, including the two upper platforms. (JA0517-0518, JA0619-0620, JA0627). Before starting work in the crystallizer room, the VLS supervisor, Andre Beason, took photographs of the PET dust accumulations. (JA0644-0650). Mr. Beason testified he had never seen that amount of dust accumulated in a room before, except when there had been a spill. (JA0626). He also testified that, based on the accumulations he found, he did not believe the crystallizer room was being cleaned on a daily basis by Innovative Fibers. (JA0642).

When he started cleaning above one of the ovens on October 16, Mr. Beason realized that the oven was still on. (JA0628-0630). Because of safety concerns, he immediately stopped working in that area and contacted the Innovative Fibers' maintenance supervisor to request that he turn the ovens off. (JA0628-0631). Mr.

Beason testified he told the maintenance supervisor that the ovens would need to be turned off for a few days to allow them to cool before VLS could continue cleaning dust from the areas above the ovens. (JA0628-0629). Because Innovative Fibers did not want to stop its manufacturing operations by shutting down the ovens, VLS stopped its work in the crystallization room. (JA0628-0630).



Despite VLS' departure without finishing the project, Innovative Fibers wanted to complete dust cleaning and removal above the ovens without stopping manufacturing operations. It thus sought another contractor with appropriate equipment and expertise to do that work. Innovative Fibers was familiar with AEO from prior communications and therefore engaged it to perform that work.

Specifically, AEO's Senior Account Manager Jim Million had begun sending emails to Innovative Fibers' management in June 2021 inquiring whether AEO

could be hired to perform any cleaning services that may be needed at the plant. (JA0676-0677). As a result, after VLS discontinued its work, Innovative Fibers hired AEO to complete VLS' original scope of work by cleaning the remaining PET dust from the upper levels of the crystallizer room, as well as removing it from the premises and disposing of it. (JA688-0690, JA0693, JA0785-0786). The Injured Workers were performing this work at the time of the explosion. (JA0658-0660, JA0663).

The emails between Innovative Fibers and AEO demonstrate both the specific nature and scope of the work as well as Innovative Fibers' recognition that it required an outside contractor to perform it. For example, Mr. Million's June 29, 2021 email regarding "Cleaning PET Waste from Top Side of Crystallizers" provided a quote for "a full 10-hour day to clean the areas on the 3rd level." (JA0670). AEO understood from Innovative Fibers that it may have been dissatisfied with VLS and was looking for a contractor to provide periodic dust cleaning at the plant. (JA0669, JA0681-0682). Therefore, Mr. Million followed up on August 5, 2021, via an email about "Cleaning PET Waste from Top Side of Crystallizers" and asked: "Does it look favorable for AEO to receive an opportunity for the next cleaning?" (JA0669).

Innovative Fibers responded on September 29, 2021, with an email request for AEO to coordinate a walkthrough of the plant "to be sure we are all on the same page so that we can get this service scheduled." (JA0661). Representatives of the

two companies met on October 6, 2021, as confirmed by an email of that date from Mr. Million stating: "The earliest we could respond to your facility to start work in the 3rd floor area would be Tuesday October 19th and Wednesday October 20th." (JA0660). Mr. Million sent follow-up emails on October 12, 2021, and October 14, 2021, seeking to confirm scheduling of PET waste cleanup work for the following week. (JA0659-0660).

Although VLS was performing periodic dust cleaning services at the plant when Mr. Million sent his October 14, 2021 email, Innovative Fibers' plant manager Chris Shuler responded via email that day: "[L]et me review and we will get back in touch with you on setting something up for monthly services." (JA0659). Innovative Fibers' maintenance manager Mike Sisk was at that time involved in discussions among Innovative Fibers' management to contract for monthly "deep cleanings" by an independent contractor, including removal of dust from the B, C, and D areas above the ovens in the crystallizer room. (JA0429-0431).

"Deep cleaning" referred to more thorough cleaning than the ordinary sweeping up and "housekeeping" by Innovative Fibers' employees on the floor of the crystallizer room. (JA0595-0596). It referenced not only a specific location (*e.g.,* the levels of the crystallizer room above the ovens) but also the thoroughness of the cleaning being conducted. ████████████████████████████████

████████████████████████████████████████████████████████

On October 27, 2021 – ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████ Mr. Million emailed that AEO "could have a Vac Truck with Driver/Operator and 2-technicians [at the plant] next Monday November 1st. Please let me know if you like to move forward with this schedule." (JA0659). ████

██████████████████████████████████████████████████████

████████████████████████████ Also that day, Mr. Million provided a revised quote to Innovative Fibers and confirmed scheduling for November 1, 2021. (JA0658).

Pursuant to the contract between AEO and Innovative Fibers dated October 28, 2021, the specific task that AEO was hired to perform at the plant was "Cleaning PET Waste and Dust from Top Side of Crystallizers, Transportation and Disposal of



Non Hazardous Waste." (JA0708). The scope of work included cleaning PET dust and waste in the crystallizer room from platforms located above the crystallizer ovens as well as offsite disposal. (JA0458).

On November 1, 2021, the Injured Workers and another AEO employee went to the Innovative Fibers plant in an AEO industrial vacuum truck to perform the outsourced work. (JA 0045). They were escorted by Mike Sisk to the crystallizer room to begin the job. (JA0455). Aside from a few minutes when a direct employee moved the in-house vacuum system on top of a pile of waste beneath one of the ovens, Innovative Fibers' direct employees did not supervise, assist, or work alongside AEO's workers; in fact, there was minimal interaction between Innovative Fibers' direct employees and AEO's workers. (JA0454-0457, JA0824-0825).

There was a large accumulation of PET dust in the crystallizer room when the Injured Workers began the job. According to the SC OSHA report, "[p]ictures of the tower area taken by [AEO] approximately 5 months before the clean-up, and during the morning of the incident, showed high levels of PET dust accumulation on areas such as, but not limited to, walking surfaces and on top of the crystallization ovens." (JA0394). Moreover, AEO's "lead person for the job stated upon arrival on the job site that there was a lot of dust, more than they normally cleaned. Pictures were sent to the office confirming the amount of dust was significantly greater than what was originally discussed with [Innovative Fibers]." (JA0716, JA0722-0727).

Shortly after 10:30 AM that morning, an explosion occurred in the crystallizer room while the Injured Workers were performing the job contracted to AEO.  Injured Workers were working on levels C and D when the explosion happened.  (JA0440-0441).  A fourth AEO worker had been vacuuming up the waste using a hose that ran to the AEO vacuum truck located outside of the plant but had briefly left the building for fresh air.  (JA0716-0717).

2.  Procedural history.

Appellants filed suit in state court on January 10, 2022.  (JA0043, JA0050, JA0058).  On February 10, 2022, Appellees removed this action to district court.  (JA0003, JA0017, JA0032).  Appellees answered the complaints on February 10, 2022.  (JA0067, JA0084, JA0101).

Appellees later filed a Motion to Dismiss for Lack of Jurisdiction Pursuant to the Statutory Employment and the South Carolina Workers' Compensation Bar ("Motion to Dismiss").[7]  (JA189).  Appellants opposed the motion.

Following a period of brief jurisdictional discovery, the district court held a hearing on the motions on November 15, 2022.  (JA1013).  On December 16, 2022,

---

[7] Appellee Stein Fibers, Ltd. also filed a Motion to Dismiss for Lack of Personal Jurisdiction.  The district court did not rule on that motion, so it is not part of this appeal.  Therefore, all references in this brief to the "Motion to Dismiss" relate to the Motion to Dismiss for Lack of Jurisdiction Pursuant to the Statutory Employment and the South Carolina Workers' Compensation Bar.

the district court issued an Order granting the Motion to Dismiss with respect to all three cases. (JA1064).

The district court granted Appellants an extension until February 14, 2023, to appeal its Order. (JA0013). Appellants appealed to this Court on February 14, 2023. (JA1082, JA1084, JA1086). On February 16, 2023, this Court consolidated Appellants' appeals.

SUMMARY OF THE ARGUMENT

The Injured Workers were directly employed by AEO – not Innovative Fibers. The Injured Workers were not Innovative Fibers' statutory employees. Therefore, the district court should have denied Appellees' Motion to Dismiss.

Innovative Fibers could only qualify as the Injured Workers' statutory employer if it hired AEO to perform work that, in its business judgment – as demonstrated by its decisions and conduct – it considered to be part of its trade, business, or occupation and its decision to subcontract was motivated by either a need to supplement and assist its workforce temporarily or a desire to avoid workers' compensation liability for injuries that workers may sustain in performing that work.

In fact, Innovative Fibers hired AEO as an independent contractor to perform specific, major waste cleanup and removal work which was discrete in scope, limited in location, specialized, and different from cleaning work that Innovative Fibers' direct employees were capable of or had previously performed.

The AEO workers did not assist Innovative Fibers' employees, who were not cleaning the area in question. In outsourcing the work, Innovative Fibers was not motivated by an effort to avoid workers' compensation liability. Rather, it subcontracted the work for legitimate business reasons that included the avoidance of increased insurance costs, the resolution of a safety hazard, the dangerous nature of the work due to its location and conditions, a lack of skilled labor and necessary equipment to perform the outsourced waste cleanup and removal work itself, and a desire to complete the work while the ovens remained in operation. The work was not part of Innovative Fibers' basic operation or primary business of manufacturing polyester fibers. Innovative Fibers was not in the business of creating waste. Consequently, AEO's work for Innovative Fibers was not part of Innovative Fibers' trade, business, or occupation.

This Court should thus hold that the Injured Workers were not Innovative Fibers' statutory employees at the time of the subject explosion and reverse the district court's ruling.

ARGUMENT

1. Standard of Review.

The Court's standard of review is de novo. As this Court recently summarized in an appeal from a district court's dismissal of another action pursuant to the

exclusivity provisions of the South Carolina Workers' Compensation Act (the

"Act"):

> We review de novo a district court's dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Baltimore*, 855 F.3d 247, 251 (4th Cir. 2017). A Rule 12(b)(1) motion to dismiss should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks omitted).

> Because federal jurisdiction here rests on the parties' diversity of citizenship, we apply South Carolina law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In determining state law, we start with the decisions of the South Carolina Supreme Court, giving "appropriate effect to all [their] implications." *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016). To the extent the state's highest court has not "directly addressed" an issue, we "anticipate" what its decision would be. *Id.* So our task here is to determine whether the Supreme Court of South Carolina would conclude that the plaintiffs were [defendants'] statutory employees at the time of the [subject] accident.

*Zeigler v. Eastman Chem. Co.*, 54 F.4th 187, 194 (4th Cir. 2022).

2. The Statutory Employment Doctrine.

An injured worker in South Carolina is generally barred from recovering in

tort against his direct employer because of the exclusive remedy provisions of the

Act. S.C. CODE ANN. § 42-1-540 (Repl. Vol. 2015). However, he retains the right

to pursue a tort action against any third party that causes his injuries. S.C. CODE

ANN. § 42-1-560 (Repl. Vol. 2015). An exception to this right is when a third party

is considered a "statutory employer" and is entitled to avail itself of the Act's exclusivity defense.[8]

A plaintiff is considered a defendant's statutory employee when the facts demonstrate he was engaged in "work which is part of [the defendant's] trade, business, or occupation" for which the defendant contracted with the plaintiff's direct employer to perform. S.C. CODE ANN. § 42-1-400 (Repl. Vol. 2015).[9] If the facts prove a plaintiff is a defendant's statutory employee, then the court must determine whether S.C. CODE ANN. § 42-1-540 (Repl. Vol. 2015) – known as the Act's "exclusive remedy provision," *Machin v. Carus Corp.,* 419 S.C. 427, 534, 799 S.E.2d 468, 472 (2017) – is applicable.[10] If so, it bars any tort recovery by the

---

[8] Appellees' Motion to Dismiss characterized this defense as "Statutory Employment and the South Carolina Workers' Compensation Bar." Cases have variously labeled the defense as the "statutory employee doctrine," the "statutory employer doctrine (or defense)," "statutory employment doctrine (or defense)," "exclusivity defense," and "exclusive remedy defense." In this brief, Appellants mainly use the term "statutory employment" but also employ the other above terms interchangeably to refer to the defense created by S.C. CODE ANN. § 42-1-400 (Repl. Vol. 2015).

[9] Although the statutory language is "trade, business, or occupation," any subtle differences among those three terms are not important in the context of this appeal. Therefore, for the sake of brevity, Appellants generally refer only to a defendant's (or Appellees') "business" when discussing the statutory employment analysis.

[10] Resolving that a plaintiff is a statutory employee does not automatically trigger application of the exclusive remedy provision. The court must still make a legal determination whether exclusivity applies. *See, e.g., Harrell v. Pineland Plantation,* 337 S.C. 313, 523 S.E.2d 766 (1999) (although plaintiff was defendant's statutory employee, defendant could not rely upon the Act's exclusive remedy provision).

plaintiff against the defendant and limits his remedies to those provided by the Act. *Carter v. Florentine Corp.,* 310 S.C. 228, 230-31, 423 S.E.2d 112, 113 (1992), *overruled on other grounds, Ballenger v. Bowen,* 313 S.C. 476, 443 S.E.2d 379 (1994).

When a defendant in a tort action claims it was the plaintiff's statutory employer and asserts the Act's exclusivity, the language of Section 42-1-400 requires the court to ascertain the nature and scope of the work for which the plaintiff's direct employer was hired and to determine whether that work was within the defendant's business, as effectively defined by the defendant.

The statute's language necessitates consideration of the specific nature and scope of the subcontracted work, not of a general description of the tasks performed by the plaintiff when injured. For example, in *Bridges v. Wyandotte Worsted Co.*, 243 S.C. 1, 132 S.E.2d 18 (1963), the South Carolina Supreme Court repeatedly made this point while applying the statute:

- It stated the trial court dismissed the case "because *the work being performed by the subcontractor* Collins, the plaintiff's employer, was a part of the trade, business or occupation of the defendant." *Id*. at 4, 132 S.E.2d at 19 (emphasis added).

- Later, it summarized the trial court's ruling as "holding that the court was without jurisdiction to entertain the present common law action for tort against the defendant, in that *the work in which the subcontractor Collins Electric Company, the employer of the plaintiff Bridges, was engaged at the time* was a part of the defendant's trade, business or occupation." *Id*. at 7, 132 S.E.2d at 20 (emphasis added).

- Stating the rule that: "Once it is established that *the work being done by the subcontractor* was a part of the general business of the owner" the Act's exclusive remedy applies to claims by the subcontractor's employees. *Id*. at 10, 132 S.E.2d at 22 (emphasis added).

- Characterizing the subcontractor's work with reference to its agreement with the defendant: "[T]he defendant contracted with Collins Electric Company, plaintiff's employer, to make the needed replacements on its transmission lines." *Id*. at 12, 132 S.E.2d at 23.

Similarly, in *Wilson v. Daniel Int'l Corp.*, 260 S.C. 548, 197 S.E.2d 686 (1973), the court reiterated that statutory employment exists "between the general contractor and the employees of a subcontractor when the latter is engaged in the execution or performance of any part of the work undertaken by such general contractor." *Id*. at 551-52, 197 S.E.2d at 687. In *Harrell v. Pineland Plantation,* 337 S.C. 313, 321, 523 S.E.2d 766, 770 (1999), the court made it clear that the initial focus should be on the work the defendant (owner) hired the plaintiff's direct employer (subcontractor) to complete.

More recently, the South Carolina Supreme Court echoed this requirement by stating that the question posed by Section 42-1-400 is "whether *the work contracted out* is 'part of [the owner's] trade, business or occupation.'" *Keene v. CNA Holdings*, 436 S.C. 1, 13-14, 870 S.E.2d 156, 162 (2021) (emphasis added).

Once the court resolves the nature and scope of the work the subcontractor was employed to perform, its inquiry then turns to determining the defendant's

business. Only then can the court meaningfully consider whether the subcontracted work triggers the application of Section 42-1-400.

Any effort to determine the scope of a company's "trade, business or occupation" must begin with the holding of the South Carolina Supreme Court's recent, watershed opinion in *Keene v. CNA Holdings*. There, the court issued an exhaustive opinion in which it addressed eighty-two years of "confusing, often conflicting" court decisions regarding the statutory employment doctrine, *id*. at 3, 870 S.E.2d at 157, before distilling holdings of more recent cases and harmonizing them with the intended purpose behind the doctrine. The result was a clarified framework within which courts – such as this one – can more correctly and consistently apply the doctrine to varied factual scenarios.

The underlying premise of the *Keene* holding was the legislative intent behind Section 42-1-400: Ensuring that defendants who outsource work to avoid workers' compensation liability remain liable for injuries to subcontractors' direct employees. *Id*. The court emphasized the difference between this type of subcontracting – which would trigger the application of Section 42-1-400 – and subcontracting for valid reasons that are commonplace in modern business, noting:

> The original purpose of the statutory employee doctrine was to prevent business managers from outsourcing work for the purpose of avoiding workers' compensation costs. That purpose has nothing to do with outsourcing work for legitimate business reasons.

*Id*. at 15, 870 S.E.2d at 163.

Recognizing that this dichotomy requires scrutiny of a defendant's decision-making as manifested by its statements and conduct, the *Keene* court provided the following framework as the proper approach for courts to employ in addressing defenses based on the statutory employer doctrine:

> In answering the question posed by section 42-1-400 – whether the work contracted out is "part of [the owner's] trade, business or occupation" – the court should focus initially on what the owner decided is part of its business. Increasingly, business managers are outsourcing work that formerly was handled as a part of the business, and they are doing so to meet the ever-increasing competitive challenges businesses face. In reality, therefore, what is or is not "part of" the owner's business is a question of business judgment, not law. If a business manager reasonably believes her workforce is not equipped to handle a certain job, or the financial or other business interests of her company are served by outsourcing the work, and if the decision to do so is not driven by a desire to avoid the cost of insuring workers, then the business manager has legitimately defined the scope of her company's business to not include that particular work.

*Id*. at 15, 870 S.E.2d at 163 (citation omitted).

In short, the key inquiries in light of *Keene* are: Did the defendant outsource the work[11] and, if so, did it do so to avoid the cost of insuring against work-related injuries or to accomplish other, legitimate business purposes? If the defendant decided to outsource the work for legitimate business reasons, then the work is not part of its business.

---

[11] Again, "the work" refers to the specific work for which the defendant hired the plaintiff's direct employer.

Before *Keene*, courts grappled with an imprecise formulation of the statutory employment analysis. The supreme court had summarized its older decisions as providing for three "tests" to address the question.

> [An] activity is considered "part of [the owner's] trade, business, or occupation" for purposes of the statute if it (1) is an important the owner's business or trade; (2) is a necessary, essential, and integral part of the owner's business; *or* (3) has previously been performed by the owner's employees. If the activity at issue meets even *one* of these three criteria, the injured employee qualifies as the statutory employee of "the owner."

*Olmstead v. Shakespeare,* 354 S.C. 421, 424, 581 S.E.2d 483, 485 (2003) (emphasis in original; citations omitted).

While the *Keene* decision did not expressly overrule cases articulating these so-called "tests," it did make clear that each is only a "valid consideration" in light of Section 42-1-400's "key question" of whether the subcontractor's work was part of the defendant's business. *Keene*, 436 S.C. at 14, 870 S.E.2d at 163. To understand the significance of each "consideration" one must drill down further into the *Keene* opinion.

Specifically, the opinion acknowledged that, before employing those inquiries to evaluate whether the subcontracted work should be considered "part of" a defendant's business, a court must ascertain the nature of the defendant's business. Once that is completed – and only if the court also concludes that the subcontractor's work is indeed part of that business – then it becomes appropriate to review whether the work was important, necessary, essential, and integral to that business.

This is clear from the fact that the first two "tests," in addition to reiterating the language of Section 42-1-400, employ judicially-adopted adjectives (important, necessary, essential, and integral) that modify and restrict the breadth of the statute's "part of" language. Those largely synonymous adjectives – terms the supreme court had used in previous cases to describe the relationship of a subcontractor's work to a defendant's business – demonstrate that a "valid consideration" when evaluating a statutory employment defense in light of *Keene* is whether a subcontractor's work is sufficiently important to a defendant's business to warrant application of the statutory employment defense. However, courts need not reach that question if the subcontractor's work is not part of a defendant's business in the first instance.

The *Keene* decision also provided guidance on how courts should afford "valid consideration" to the third "test" – whether the subcontractor's work "has previously been performed by the owner's employees." Importantly, it established that the answer to that question is not outcome-determinative. In other words, in some cases, a defendant's use of its own employees to perform the same work as the subcontractor will result in a finding of statutory employment but, in other instances, it will not. Again, the touchstone is the defendant's reason for subcontracting.

This conclusion is evident from the *Keene* court's reliance on *Bridges v. Wyandotte Worsted Co.*, 243 S.C. 1, 132 S.E.2d 18 (1963) and *Wilson v. Daniel Int'l Corp.*, 260 S.C. 548, 197 S.E.2d 686 (1973) as foundations for its holding. In each

of those cases, the defendant had used its own employees to perform the same work for which it engaged a subcontractor. However, the holdings in the cases differed. Therefore, a comparison of those cases – as well as other decisions with similar facts and outcomes – is helpful in applying *Keene* to subsequent cases.

In *Bridges*, the court concluded the subcontractor was engaged in work that was part of the defendant's business. Its holding was not simply based on the fact the defendant had previously used its own employees to do the work. Importantly, the court relied on defendant's business decisions to continue using its employees to do that work and to supplement its workforce temporarily with a subcontractor, on one occasion, for legitimate business reasons (excessive overtime worked by its own employees) that did not indicate defendant was excluding the work from its business. *Keene*, 436 S.C. at 9, 870 S.E.2d at 160.

The *Bridges* holding is consistent with other, more recent decisions involving subcontracted workers supplementing a defendant's workforce.

For example, in *Poch v. Bayshore Concrete Products/S.C.*, 405 S.C. 359, 747 S.E.2d 757 (2013), the court held a subcontractor's employees were engaged in statutory employment because the defendant's workforce was reduced by departures of its employees and it decided to hire a subcontractor to provide temporary laborers to assist and to supplement its direct employees, such that "both leased and regular

employees all worked together" to complete the work. *Id*. at 364, 369, 747 S.E.2d at 760, 762.

Likewise, in *Edens v. Bellini*, 359 S.C. 433, 597 S.E.2d 863 (Ct. App. 2004), the court found the plaintiff was a statutory employee because he was under the direction of defendant's direct employees while assisting them in performing work which defendant's employees also had done in the past without the assistance of subcontracted labor. *Id*. at 443-44, 369, 597 S.E.2d at 868-69. As in *Poch*, the subcontracted workers and the defendant's direct employees were working "side-by-side" when the plaintiff was injured.

In sum, these cases demonstrate that, when a defendant has historically used its own employees to perform work that is part of its business but, to accomplish valid business purposes, decides to supplement those employees with subcontracted labor – not to replace but to assist its direct employees – this is not an outsourcing of work that excludes it from the defendant's business. Rather, in each case, the defendant did not outsource the work;[12] instead, it continued to have the work performed by its employees, along with subcontracted workers, thereby defining its business as including the work.

---

[12] Notably, the court did not use the terms "outsource" or "outsourcing" to describe the defendants' business decisions in any of those cases. Likewise, in *Keene*, it did not refer to the *Bridges* defendant's choice to supplement its workforce with temporary workers as "outsourcing."

On the other hand, *Wilson v. Daniel Int'l Corp.*, upon which the *Keene* court relied, reached a contrary result. Despite the fact the defendant had employees who did concrete work and had used those employees to perform concrete work on other projects, the *Wilson* court held that a concrete subcontractor's employee was not engaged in statutory employment when injured. Again, its decision did not depend on the answer to the question of whether the defendant's employees had performed the same work on other occasions; rather, it was based on the defendant's reasons for outsourcing all concrete work on a specific project to the subcontractor (*i.e.*, its business judgment): "If [the defendant] had not chosen – for economic reasons – to use a contractor for this particular job, its own employees would have been doing the work." *Keene*, 436 S.C. at 10, 870 S.E.2d at 160. In contrast to *Bridges* (as well as *Poch* and *Edens*), the defendant in *Wilson* was not using the subcontractor to supplement or to assist its own work force on the project in question.

In accordance with the "subcontracting to supplement" versus "outsourcing" distinction, this Court in *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187 (4th Cir. 2022) concluded that, although the defendant had previously used its own employees to perform the maintenance work at issue, once it outsourced that work to the plaintiffs' direct employer, the defendant effectively defined the scope of its business to exclude the subcontracted work. *Id.* at 196-97. As a result, the Court held the defendant was not the plaintiffs' statutory employer. It rejected the argument that

defendant's previous use of its own employees to do the work required a finding of statutory employment, noting such a result "would turn *Keene* on its head." *Id*. at 197. Instead, the Court distilled the *Keene* decision as follows:

> The animating principal of *Keene* is that business managers are entitled, for legitimate business reasons, to "outsourc[e] work that formerly was handled as a part of the business," and that when they do, the contractors who perform that work will not become statutory employees by virtue of this new "business judgment."

*Id*., *citing Keene*, 436 S.C. at 14, 870 S.E.2d at 163.

*Keene* acknowledged the validity of the different outcomes in *Bridges* and *Wilson* although each involved work that had been done by a defendant's direct employees. To reconcile the results, one must first acknowledge that work by a defendant's direct employees is not a binary "test" of statutory employment but a "consideration" in the context of scrutinizing the nature and scope of a defendant's business in light of actions it took as a product of its business judgment. *Keene*, 436 S.C. at 14, 870 S.E.2d at 163. That is not simply a question of whether the defendant had previously used its employees to do that work; rather, the court must inquire as to whether the defendant also continued to use its employees to do the work and why it engaged a subcontractor. *See Zeigler*, 54 F.4th at 197.

If a defendant continues to use its employees to do the same work it subcontracts out, that is arguably not "outsourcing"; however, when it decides a subcontractor is better suited than its employees to complete a specific task, project,

- 31 -

or portion of its overall business, it has indeed "outsourced" the work. *See Bilheimer v. Federal Exp. Corp. Long Term Disability Plan*, 605 Fed. Appx. 172, 179 (4th Cir. 2015), *citing* NEW OXFORD AMERICAN DICTIONARY 1246 (3d Ed. 2010) (as "defining 'outsource' as 'obtain (goods or a service) from an outside or foreign supplier, *esp. in place of an internal source.*'") (emphasis added).[13]  If there is a legitimate business purpose for that outsourcing, the defendant has defined "the scope of [its] business to not include that particular work." *Keene*, 436 S.C. at 14, 870 S.E.2d at 163.

The *Keene* decision is also significant for reaffirming the importance of the holding in *Glass v. Dow Chem. Co.*, 325 S.C. 198, 482 S.E.2d 49 (1997) and contextualizing it within the statutory employment analysis as applied in *Keene*.

---

[13] Also see *Sourcecorp BPS, Inc. v. Kenwood Records Mgmt.*, 548 F. Supp. 2d 673 (S.D. Iowa 2008), in which the court discussed the "plain meaning" of the term "outsourcing" and reviewed the following resources:

> Dictionary.com. Dictionary.com Unabridged (v 1.1). Random House, Inc. http://dictionary.reference.com/browse/outsourcing (accessed: April 23, 2008) ("[T]o obtain goods or services from an *outside* supplier or source." (emphasis added)); Investopedia.com. Investopedia Inc. http://www.investopedia.com/terms/o/outsourcing.asp (accessed: April 23, 2008) ("A practice used by different companies to reduce costs by transferring **portions of work** to outside suppliers ***rather than completing it internally.***" (emphasis added)). *Cf. Sandoval v. Apfel*, 86 F. Supp. 2d 601, 603 n.2 (N.D. Tex. 2000) ("Outsourcing is defined as  [t]he assignment of **tasks** to *independent* contractors, such as individual consultants or service bureaus." (quotation omitted) (alteration in original) (emphasis added)).

548 F. Supp. 2d at 679 (bold emphasis added).

*Glass* not only presaged *Keene's* correct focus on the legislative purpose behind the statutory employment doctrine, *see Keene*, 436 S.C. at 3, 870 S.E.2d at 157, it also remains instructive on the limits within which to apply the doctrine. In this latter regard, the impact of the *Glass* decision is twofold.

First, when focusing on the nature and scope of the work for which a subcontractor was engaged, *Glass* establishes one of the clearer principles of statutory employment jurisprudence; that is, when subcontracted work is "major" or "specialized" it is not considered part of the defendant's business. *Glass*, 325 S.C. at 202, 482 S.E.2d at 51; *see also Edens v. Bellini*, 359 S.C. at 444, 597 S.E.2d at 869 (finding statutory employment because the work performed by the plaintiff via the subcontractor "was neither special nor unique.").

Secondly, like *Bridges* and *Wilson*, *Glass* provides guidance on the broader question of defining a defendant's business. There, the court held that when repair work is "of the sort which the employer is not equipped to handle with its own work force, [it is] not part of the business." *Glass*, 325 S.C. at 202, 482 S.E.2d at 51.[14] It also held that a decision to subcontract which was motivated by legitimate business reasons unrelated to the avoidance of workers' compensation liability – in that case,

---

[14] This conclusion is of course consonant with the cases discussed above which found statutory employment when subcontracted workers supplemented and assisted a defendant's workforce but reached the opposite conclusion when a specific task, project, or portion of the defendant's business was outsourced for legitimate reasons.

the defendant's desire to settle a warranty claim and thereby to avoid litigation costs by outsourcing repair work that was not part of its "basic operation," *id.* – illustrates the defendant did not consider the outsourced work part of its business. *Keene*, 436 S.C. at 10, 870 S.E.2d at 160-61.

The *Keene* court's discussion of *Abbott v. The Limited*, 338 S.C. 161, 526 S.E.2d 513 (2000) and *Olmstead v. Shakespeare,* 354 S.C. 421, 581 S.E.2d 483 (2003) further informs the parameters of its decision. Specifically, *Keene* made clear that *Abbott* and *Olmstead* stand for the proposition that subcontracted work, even if important to a defendant's business, is not part of that business if it is only ancillary thereto and is "not the primary business" of the defendant. *Keene*, 436 S.C. at 11, 870 S.E.2d at 161, *quoting Olmstead*, 354 S.C. at 425, 581 S.E.2d at 485; *accord Glass*, 325 S.C. at 202, 482 S.E.2d at 51 (distinguishing "activities [that] were not related to the basic operation" of a defendant's business). Thus, transportation of goods to a defendant retailer or from a defendant manufacturer were not part of either defendant's business for purposes of determining statutory employment.

Therefore, in light of *Keene*, the questions for a court to consider in a statutory employment analysis may be summarized as follows:

1. What was the nature and scope of the work for which the defendant hired the subcontractor (plaintiff's direct employer)?

   a. Was it major?

   b. Was it specialized?

2. What was the nature and scope of the defendant's trade, business, or occupation?

   a. What was the defendant's "basic operation"?

   b. Was the defendant equipped to do the subcontracted work with its own employees?

   c. Had the defendant used its own employees to do the same work in the past?

3. Was the work for which the defendant hired the subcontractor part of the defendant's trade, business, or occupation?

   a. Was the subcontracted work part of the defendant's primary business or basic operation?

   b. Was the subcontracted work an important, necessary, essential, or integral part of the defendant's trade, business, or occupation?

   c. If the defendant had previously used its employees to do the work, did its employees continue to perform the same work alongside and assisted by the subcontracted workers or did the defendant outsource the work?

   d. If the work was outsourced, did the defendant decide to outsource the work for legitimate business reasons?

4. Did the plaintiff's injury arise out of and in the course of his employment for the subcontractor?

If the court finds a plaintiff is a statutory employee, it must then determine whether the Act's exclusive remedy provisions apply. *See Harrell v. Pineland Plantation,* 337 S.C. at 325-26, 523 S.E.2d at 772-73.

3. <u>AEO's Work for Innovative Fibers.</u>

The district court only superficially addressed the initial part of the statutory employer inquiry. Instead of determining the specific nature and scope of AEO's

work for Innovative Fibers, it referred to AEO's work as "cleaning," a general term that applies in some way to any business. The district court's Order granting the Motion to Dismiss stated:

- "Plaintiffs were injured while performing cleanup work at the Innovative Fibers facility." (JA1065).

- "Innovative Fibers contracted with AEO to clean the Innovative Fibers facility on November 1, 2021." (JA1067).

This approach to the statutory employment analysis reflects a broad overgeneralization that is at odds with the requirements of applicable case law. Here, Innovative Fibers did not engage AEO to perform generalized "cleaning." Rather, it outsourced to AEO a major, specialized task that was limited to a specific area of the plant.

When VLS discontinued its work at the plant, it had only cleaned lower levels of the crystallizer room. Innovative Fibers still needed a contractor to clean the levels above the ovens[15] and to dispose of the waste properly before the upcoming insurance inspection. It needed the work done without interrupting manufacturing operations. Innovative Fibers thus defined the scope of the outsourced work as

---

[15] Of course, given the fact that manufacturing operations continued to generate dust during the approximately two weeks after VLS' departure and the fact that waste removal on upper levels would unavoidably result in some dust gravitating to lower levels, the contractor would also have to do incidental dust removal at lower levels to finish cleaning the crystallizer room properly.

cleaning and removing dust from the areas of the crystallizer room above the ovens while the ovens continued to operate.

The scope of the outsourced work is further confirmed by the emails and quotes exchanged between AEO and Innovative Fibers. They refer to the areas to be cleaned as the "Top Side of Crystallizers" (JA0708), "the areas on the 3rd level" (JA0670), and "the 3rd floor area." (JA0660). Innovative Fibers was simultaneously considering – and AEO was quoting – monthly "deep cleanings" by an independent contractor that included dust removal from the B, C, and D areas above the ovens in the crystallizer room. (JA0429-0431).

There is no question Innovative Fibers was planning to have this work done by an outside contractor, ████████████████████████████████████

██████████████████████████████████████████████████████

████████████ Its own employees had not done "deep cleaning" in the areas above the ovens except perhaps when the plant shut down twice a year and, even then, less adequately than necessary for the insurance inspection.

Even if this happened, it was not the same work for which AEO was hired because the ovens would not have been operating when Innovative Fibers' employees may have cleaned those areas. Thus, the method of cleaning would have been different. Instead of simply sweeping and boxing up the dust, AEO would be providing workers with personal protective equipment, a "liquid ring/air mover" (a

high-power vacuum truck), suction/transfer hoses, and other equipment.  (JA0684, JA0708).  The vacuum truck and hoses were important because they permitted AEO to containerize the waste for offsite disposal.  Plus, they were necessary because Innovative Fibers' vacuum system did not reach the upper levels and was only meant for daily cleaning, not as a substitute for deep cleaning.  (JA0415, JA0831-0832).

The outsourced work was not only in these regards specialized, but it was also major in nature.  Plant manager Chris Shuler characterized as "major" (JA0292) his understanding of the cleaning work done by Innovative Fibers' employees in the plant (areas not specified) during the July 2021 plant shutdown ("cleanup week"), the sweeping and vacuuming done by its employees in unspecified areas of the crystallizer room on October 17, 2021, and the maintenance crew's vacuuming of dust off the top of the ovens on October 24, 2021. (JA0292-0293, JA0747-0756, █████████████).

As discussed above, if Innovative Fibers' employees cleaned dust from areas above the ovens before AEO's work, it would have been during plant shutdowns; therefore, if that work was "major" in July 2021, it follows that AEO's work in those areas on November 1, 2021, to achieve a "like new" condition should likewise be considered major.[16]  The above-referenced work on October 17, 2021 and October

---

[16] Mr. Shuler agreed the work AEO was hired to perform would be the same but in different areas.  (JA0536).

24, 2021 (between VLS' departure and AEO's commencement of work) is not specific to the areas above the ovens[17] but the fact workers used vacuums to clean significant waste accumulations which Innovative Fibers urgently wanted removed demonstrates that the work AEO was hired to perform in areas above the ovens should also be characterized as major.

This fact is further borne out by the "normal cleaning" versus "deep cleaning" distinction made by several Innovative Fibers representatives. Mr. Shuler described employees' semi-annual cleaning of the crystallizer room during plant shutdowns as a "deep clean or heavy clean of the room." (JA0198, JA0534-0535). Mr. Shuler or Mr. Sisk told SC OSHA that "because of the high accumulations of combustible dust" Innovative Fibers had decided to begin deep cleaning in areas above the ovens more frequently and had therefore engaged an outside contractor. (JA0889-0890). Mr. Stein confirmed that the outsourced cleaning work was for deep cleaning of the crystallizer room. (JA0323-0325). An Innovative Fibers supervisor, Terrence Meadows, agreed outside contractors, not direct employees, had used vacuums to deep clean areas above the ovens. (JA0733-0734). In this context, the contrast between normal cleaning (housekeeping) and deep cleaning demonstrates the latter is in the nature of "major" work that Innovative Fibers outsourced.

---

[17] To the contrary, production manager Benjamin Wentz testified the cleaning on October 17, 2021, was only on the floor of the crystallizer room. (JA0917-0918).

In sum, AEO was hired to perform deep cleaning work in a specific area of the crystallizer room to return the area to a "like new" condition, using special equipment that AEO provided. The work was major and different from normal cleaning work performed by Innovative Fibers' employees. AEO's work was in areas of the room that Innovative Fibers' employees did not clean during normal plant operations. To the extent Innovative Fibers had performed cleaning in the crystallizer room, it was inadequate to prevent large accumulations of dust in areas above the ovens, thus the necessity of bringing in an outside contractor to clean those areas and to dispose of the waste.

Consistent with *Glass v. Dow Chem. Co.*, 325 S.C. at 202, 482 S.E.2d at 51 ("[W]here repairs are major, specialized, or of the sort which the employer is not equipped to handle with its own work force, they are not part of the business."), the Court should hold that the work outsourced to AEO was not part of Innovative Fibers' business. *See also Keene*, 436 S.C. at 10, 870 S.E.2d at 161 ("[C]orporate managers often choose not to make major or otherwise specialized repairs part of their business.").

4. <u>Innovative Fibers' Trade, Business, or Occupation.</u>

Innovative Fibers' primary business or basic operation is the production of polyester fiber. (JA0194, JA0321). It is not in the cleaning or waste disposal business; but, like any manufacturing facility (and probably any business), it

generates waste and has cleaning needs. It did not have a dedicated cleaning crew, written policies for cleaning of PET dust in the crystallizer room, or a set cleaning schedule for that room. (JA0405, JA0410, JA0501, JA0566). In short, cleaning and waste removal were ancillary to but not part of Innovative Fibers' business.

More pointedly, cleaning and removal of PET dust from areas above the crystallizer ovens – the work Innovative Fibers outsourced to AEO – was at most done rarely and certainly not as a part of Innovative Fibers' typical operations. When that work was arguably performed by Innovative Fibers' own employees, it was only when normal production operations were stopped for semi-annual plant shutdowns. The cleaning in those areas was done so infrequently that it was inadequate to avoid potential safety and financial problems for Innovative Fibers. Innovative Fibers did not have the equipment necessary to do this work without shutting down its primary and basic operation of fiber production.

Nothing about the work subcontracted to AEO indicates it was part of Innovative Fibers' business, much less an important, necessary, essential, or integral part of it. That cleaning and waste removal may have been important to Innovative Fibers in general does not differentiate it from any other businesses that have cleaning and waste disposal needs. Moreover, the statutory employment analysis requires a subcontractor's work to be an important, necessary, essential, or integral

*part of* a defendant's business, not just important, necessary, essential, or integral *to* its business.

The district judge focused on whether Innovative Fibers had decided to outsource cleaning above the ovens on a periodic basis. (JA1067, JA1073-1074). Not only does the evidence refute his conclusion that no such decision had been made,[18] his focus was misplaced. The important and undisputed fact is that Innovative Fibers clearly decided to outsource this specific job, task, or project to AEO. *Keene* therefore requires an inquiry into why it did so. The evidence on that topic is likewise clear: Innovative Fibers was motivated by legitimate business

---

[18] The district court relied primarily on Appellees' employees' conclusory, post-litigation statements that no final decision was made. However, documentation that immediately preceded subcontracting to AEO tells a different, more believable story.

On October 25, 2021, Innovative Fibers' insurance broker sent a recommendation to hire a subcontractor to clean dust from the plant at least monthly (JA0654). It is also worth noting that Mr. Shuler's email of October 14, 2021 to AEO stating he would "get back in touch …on setting something up for monthly services" (JA0130), upon which the district court relied (JA1073), is actually consistent with fact that Innovative Fibers intended to schedule monthly dust cleaning by AEO after the immediate cleaning needs were done.

judgment to avoid increased insurance costs (as well as considerations of the major, specialized nature of the work and its inability to do the work with its own employees while its primary business operations continued) and not by a desire to avoid workers' compensation liability. Under *Keene*, Innovative Fibers thus defined its business as excluding deep cleaning of areas above the ovens during normal plant operations.

At this stage of the analysis, the statutory employment doctrine, as informed by *Keene*, requires consideration of cleaning by Innovative Fibers' employees as compared with the work Innovative Fibers subcontracted to AEO.

The district judge believed that previous cleaning Innovative Fibers had its employees perform at the plant – not the specific work it hired AEO to do – was the determinative factor in the statutory employment inquiry. (JA1076). The premise for this conclusion was his reliance upon another district judge's opinion in a case that pre-dated the *Keene* decision, *Provau v. YRC, Inc.*, 2017 WL 1541880, 2017 U.S. Dist. LEXIS 64580 (D.S.C. Apr. 28, 2017). However, the holding in that case is not valid in light of *Keene*.

Initially, *Provau* relies upon the three "tests" of statutory employment that *Keene* made clear are only considerations. Also, *Provau* fails to employ *Keene's* focus on business judgment to define what is part of the defendant's business. Finally, instead of undertaking the proper initial inquiry of determining the scope of

work for which the subcontractor was hired to perform, *Provau* applies a flawed construction of the "third test" (*i.e.*, has the identical activity previously been performed by the owner's employees?) to reach a conclusion that cannot be reconciled with *Keene*. Specifically, the judge in *Provau* reasoned:

> Regarding the third test, and as to Plaintiff's argument that there are no other employees at the YRC's Florence location who engage in a role with his same specialized skills, based on the additional testimony now in the record, this Court finds this argument to be unpersuasive, as well. The corporate representatives of both YRC and Poston confirm that employees of YRC not only possess the knowledge and skill to perform this work, but employees actually perform this work for YRC, though not at YRC's Florence location. YRC has approximately 1,000 mechanics across the country at business terminals that do exactly the type of repair work plaintiff was doing. YRC explained that Florence is a smaller terminal, therefore it is more efficient to leave this work to a contractor.

*Provau*, 2017 U.S. Dist. LEXIS 64580, *7-8 (citations to record omitted).

Pursuant to *Keene*, these facts demonstrate a valid business decision to outsource repair work at YRC's Florence location for the sake of efficiency, just as *Keene* recognized the validity of the defendant's decision to outsource concrete work for a specific project in *Wilson v. Daniel Int'l Corp.*, 260 S.C. 548, 197 S.E.2d 686 (1973), despite the fact that it had employees who were capable of doing the same work and who did the same work at other locations. Under *Keene*, the result in *Provau* would have been different.

In sum, the district court erred in relying upon *Provau* to conclude: "The Court agrees with Defendants that the nature of the activity, not the precise physical

location of the work, determines whether Plaintiffs were statutory employees at the time of their Plaintiffs' [sic] injuries." (JA1076). Instead, in light of *Keene* and preceding caselaw, the proper inquiry is initially into the work the defendant contracted out to the plaintiff's direct employer. *Keene*, 436 S.C. at 13-14, 870 S.E.2d at 162; *Harrell v. Pineland Plantation,* 337 S.C. at 321, 523 S.E.2d at 770; *Wilson*, 260 S.C. at 551-52, 197 S.E.2d at 687. As discussed above, an analysis of that topic demonstrates the work Innovative Fibers hired AEO to perform was discrete, limited, major, and specialized.

Having addressed that question, the relevance of work done by Innovative Fibers' direct employees is not as broad as the district court found. Certainly, the fact that employees had done some form of cleaning would not automatically make any cleaning by a subcontractor part of Innovative Fibers' business. Rather, the inquiry is whether, as part of its basic operation, Innovative Fibers had previously used its employees to perform the same work that it subcontracted to AEO. If it had not, then the subcontracted work was not part of its business. However, if it had, the Court must then determine whether engaging a subcontractor reflected an exercise of business judgment to outsource that work for legitimate business reasons; if so, then Innovative Fibers defined its business to exclude the outsourced work.

The evidence of Innovative Fibers' employees cleaning areas above the crystallizer ovens is conflicting. The district court relied upon testimony from

Christopher Austin Clark and Michael Sisk on this topic. (JA1077). Mr. Clark's testimony actually shows that his cleaning work was in connection with his maintaining equipment in the crystallizer room (JA0829) and that, after the crystallizer ovens were installed, was limited to areas on or below the ovens and connected platforms. (JA0827-0829, JA0831). He also confirmed that Innovative Fibers' vacuum system would not reach areas above the tops of the ovens. (JA0831-0832). Mr. Sisk confirmed that cleaning levels above the ovens was not routinely scheduled and may have only been done once or twice by Innovative Fibers' employees during semi-annual plant shutdowns. (JA0408-0409, JA0482-0484).

Even taking the evidence on this topic most favorably to Appellees, it would only demonstrate that, because Innovative Fibers had no dedicated cleaning crew, its production workers may have cleaned areas above the ovens when the plant was shut down – that is, at times when Innovative Fibers was not involved in its primary business or basic operation of manufacturing fibers. However, those employees would not have been available to do their normal work and to complete a multi-day cleaning task in an environment which presented safety hazards that caused VLS to stop working. Moreover, there is no evidence that Innovative Fibers planned to continue having its employees perform "deep cleaning" in areas above the ovens (even during shutdowns) after it outsourced that work to outside contractors. One

certainly would not expect as much given that the intended result of outsourcing the work was to eliminate dust accumulation in those areas.

From Mr. Clark's and Mr. Sisk's scant and conflicting testimony, the district court should not have concluded that PET dust cleaning and removal from areas above the ovens in the crystallizer room were parts of Innovative Fibers' primary business. At most, the evidence shows that cleaning in these areas, if done at all, was rarely performed and was not part of Innovative Fibers' typical operations. Plus, that work was outsourced to VLS until it stopped work at the plant and then to AEO.

Regardless of the disputed evidence of Innovative Fibers' employees cleaning in areas above the ovens, it is clear that they did not supervise, assist, or work alongside VLS or AEO workers when they cleaned in those areas. Rather, when Innovative Fibers subcontracted the cleaning of the crystallizer room, it outsourced that work. Thereafter, prior to the explosion, the only ongoing work by Innovative Fibers' employees which could be described as "cleaning" in that area was the daily "housekeeping" that consisted of sweeping up on the floor of the crystallizer room (or weekly cleaning the interiors of the ovens themselves, a totally different task).

5. Injured Workers Were Performing Work that Innovative Fibers Outsourced to AEO.

As noted above, at the time of the explosion, the Injured Workers were cleaning PET dust from levels above the ovens. Per its contract with Innovative Fibers, AEO would vacuum that dust into its truck and then dispose of it offsite.

The district court focused on the Injured Workers' precise activities at the time of the explosion: "[T]he Court finds that, at the time of the accident, Plaintiffs were involved in cleaning the PET dust – not packaging or disposing of it." (JA1075). Contrary to the district court's view, the fact that the disposal aspect of the outsourced work was not happening at the time of the explosion is irrelevant to the statutory employment inquiry. What is relevant is whether the Injured Workers' injuries arose out of and in the scope of their employment with AEO. As the court explained in *Harrell v. Pineland Plantation*:

> Harrell's argument that the focus should be solely on the activity of the worker at the time the injury collapses our two step analysis into one. If the Court adopted Harrell's approach, employees of a subcontractor would constantly move in and out of workers' compensation coverage throughout the workday based on the type of work they were engaged in at that very moment. …
>
> As discussed above, the important factor is the relationship between the work [subcontractor] has been hired to do for [defendant] and that work's relationship to the business of [defendant].

337 S.C. at 324, 325, 523 S.E.2d at 771, 772.

Here, there is no disputing Injured Workers sustained injuries arising out of and in the scope of their employment with AEO. And because AEO was performing work that Innovative Fibers had outsourced for valid business reasons, Injured Workers' work was not part of Innovative Fibers' business.

<u>CONCLUSION</u>

Because the activity performed by Appellants for AEO at the time of the explosion was not work that was part of Innovative Fibers' trade, occupation, or business, Appellants were not Appellees' statutory employees. Appellants should therefore be free to pursue their tort actions against Appellees. Thus, Appellants request that this Court reverse the district court's dismissal of these actions and remand them to the district court for further proceedings.

Respectfully submitted,

BY: */s/ Bert G. Utsey, III*
Bert G. Utsey, III
Samuel R. Clawson, Jr.
Christina Rae Fargnoli
CLAWSON FARGNOLI UTSEY, LLC
2 Amherst Street
Charleston, SC 29403
(843) 970-2700
bert@cfulaw.com
sam@cfulaw.com
christy@cfulaw.com

and

Charles T. Slaughter
MORGAN LITIGATION GROUP, LLC
135 East Main Street
Lexington, SC 29072
(803) 359-6194
chuck@morganlitigation.com

Attorneys for Appellants

Patrick H. Allan
Lee Law Offices
P.O. Box 2229
Spartanburg, SC 29304
(864) 978-9519
pallan@leelawoffices.org

Attorney for Appellants Riley Draper,
William Douglass, and Jessica Douglass

May 3, 2023
Charleston, South Carolina

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachment):

this document contains <u>12,367</u> words.

2.     This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


Dated: May 3, 2023