No. 23-1163

In The
United States Court of Appeals
For the Fourth Circuit

PARKER O'NEIL WIDEMAN; RILEY C. DRAPER;
WILLIAM F. DOUGLASS; JESSICA L. DOUGLASS

*Plaintiffs-Appellants,*

*v.*

INNOVATIVE FIBERS LLC; STEIN FIBERS LTD

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court for the
District of South Carolina at Spartanburg

**BRIEF OF APPELLEES**

H. Sam Mabry, III                          Kevin Lindsay Terrell
Jonathan D. Klett                          THE WARD LAW FIRM PA
HAYNSWORTH SINKLER BOYD, P.A.              P.O. Box 5663
P.O. Box 2048                              Spartanburg, SC 29304
Greenville, SC 29602                       T: 864.573.8500
T: 864.240.3200                            lterrell@wardfirm.com
smabry@hsblawfirm.com
jklett@hsblawfirm.com

*Counsel for Appellees*                    *Counsel for Appellees*

### UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1163        Caption: Parker O'Neil Wideman v. Innovative Fibers LLC; Stein Fibers LTD

Pursuant to FRAP 26.1 and Local Rule 26.1,

Stein Fibers LTD
(name of party/amicus)

who is _____Appellee_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    As of February 28, 2023, SFI AIP Borrower LLC, a Delaware Limited Liability Corporation is the parent of Stein Fibers LTD, a Delaware Limited Liability Corporation.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

12/01/2019 SCC                    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐ YES ☑ NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐ YES ☑ NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: s/ H. Sam Mabry                        Date:        02/28/23

Counsel for: Appellee Stein Fibers LTD

- 2 -

[Print to PDF for Filing]

ii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1163        Caption: Parker O'Neil Wideman v. Innovative Fibers LLC; Stein Fibers LTD

Pursuant to FRAP 26.1 and Local Rule 26.1,

Innovative Fibers LLC
(name of party/amicus)

who is _____ Appellee _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☑YES ☐NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    As of February 28, 2023, SFI AIP Borrower LLC, a Delaware Limited Liability Corporation is the parent of Innovative Fibers LLC, a Delaware Limited Liability Corporation.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                     - 1 -

iii

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: s/ H. Sam Mabry                    Date:  02/28/23

Counsel for: Appellee Innovative Fibers LLC

- 2 -

[ Print to PDF for Filing ]

iv

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................... vii

STATEMENT OF ISSUES ........................................................1

STATEMENT OF THE CASE....................................................2

     I.     INNOVATIVE'S BUSINESS AND
           MANUFACTURING PROCESS .........................................3

     II.    CLEANING AT THE PLANT .............................................9

     III.   INNOVATIVE'S CONTRACT WITH AEO,
           PLAINTIFFS' DIRECT EMPLOYER ...............................12

     IV.   PROCEDURAL HISTORY ...............................................14

SUMMARY OF ARGUMENT .................................................16

ARGUMENT ........................................................................19

     I.     STANDARD OF REVIEW ...............................................19

     II.    THE DISTRICT COURT CORRECTLY APPLIED *KEENE*,
           *ZEIGLER* AND *BRIDGES* IN LIGHT OF THE
           FACTS IN THE RECORD. ...............................................21

           A.    THE DISTRICT COURT CORRECTLY
                 CONCLUDED THE FACTS HERE ARE
                 ANALGOUS TO THE SOUTH CAROLINA
                 SUPREME COURT'S DECISION IN *BRIDGES*....................21

           B.    THE DISTRICT COURT CORRECTLY
                 FOCUSED ON THE ACTIVITIES OR TASKS
                 PLAINTIFFS WERE PERFORMING WHEN
                 THE FLASH FIRE STARTED.................................33

           C.    PLAINTIFFS' DEFINITION OF "OUTSOURCING"
                 WOULD END STATUTORY EMPLOYMENT .....................35

v

D.   PLAINTIFFS WERE CLEANING PET WASTE
AND DUST AS PART OF A CLEANING PROJECT
ALSO BEING PERFORMED BY
INNOVATIVE EMPLOYEES ...................................................37

III.   THE DISTRICT COURT CORRECTLY APPLIED THE THREE
TRADITIONAL TESTS FOR STATUTORY EMPLOYMENT IN
LIGHT OF THE FACTS IN THE RECORD .....................................39

A.   APPLICATION OF THE THREE TESTS SHOWS
THAT CLEANING WAS PART OF INNOVATIVE'S
BUSINESS ................................................................39

B.   PLAINTIFFS' PROPOSED "STATUTORY
EMPLOYMENT ANALYSIS" IS CONTRARY TO
THE REQUIRED CONSTRUCTION IN FAVOR OF
STATUTORY EMPLOYMENT AND SOUTH
CAROLINA APPELLATE COURT DECISIONS ..................41

C.   PLAINTIFFS' ATTEMPTS TO DISTINGUISH
THEIR CLEANING ON NOVEMBER 1, 2021,
FROM THE CLEANING PERFORMED BY
INNOVATIVE EMPLOYEES ARE NOT SUPPORTED
BY THE FACTS IN THE RECORD OR SOUTH
CAROLINA APPELLATE COURT DECISIONS ..................49

CONCLUSION ......................................................................61

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abbott v. The Limited, Inc.*,
526 S.E.2d 513 (S.C. 2000) ...............................................................33,40

*Brack v. CPPI of Ga., LLC*,
849 S.E.2d 521 (Ga. Ct. App. Ct. 2020) ...................................................41

*Bresler v. Wilmington Trust Co.*,
855 F.3d 178 (4th Cir. 2017) ...................................................................8

*Bridges v. Wyandotte Worsted Co.*,
132 S.E.2d 18 (S.C. 1963) .............................. 20,21,23,36,37,39,44,45,48,49,51,52

*Carrier v. Westvaco Corp.*,
806 F.Supp. 1242, (D.S.C. 1992),
*aff'd per curiam*, 46 F.3d 1122 (4th Cir. 1995) .....................................20

*Catawba Indian Tribe v. State of S.C.*,
978 F.2d 1334 (4th Cir. 1992) .................................................................53

*Chew v. Newsome Chevrolet, Inc.*,
431 S.E.2d 631 (S.C. Ct. App. 1993) ......................................................45

*Collins v. Charlotte*,
772 S.E.2d 510 (S.C. 2015) ......................................... 20,21,34,35,36,40,41,42,43,
...................................................................................44,45,49,51,55,56

*Collins v. Charlotte*,
732 S.E.2d 630, 631 (S.C. Ct. App. 2012) ...........................................56

*Connelly v. Main Street Am. Grp.*,
886 S.E.2d 196 (S.C. 2023) ..................................................................22,45,59

*Consumer Fin. Prot. Bureau v. Klopp*,
957 F.3d 454 (4th Cir. 2020) .................................................................15

*Corollo v. S.S. Kresge Co.*,
456 F.2d 306 (4th Cir. 1972) ...................................................................36

*Doane v. E. I. DuPont De Nemours & Co.*,
209 F.2d 921 (4th Cir. 1954) ..................................................................41

*Duke Energy Corp. v. S.C. Dep't of Rev.*,
782 S.E.2d 590 (S.C. 2016) ...................................................................56

*Edens v. Bellini*,
597 S.E.2d 863 (S.C. Ct. App. 2004)..........................................20,34,45

*Evans v. Techs. Applications & Serv. Co.*,
80 F.3d. 954 (4th Cir. 1996) ...................................................................16

*Fortner v. Thomas M. Evans. Constr. & Dev., LLC*,
741 S.E.2d 538 (S.C. Ct. App. 2013).................................. 19,35,36,37,40,42,44,45

*Glass v. Dow Chem. Co.*,
482 S.E.2d 49 (S.C. 1997) ....................................................20,23,49,51

*Hancock v. Wal-Mart Stores, Inc.*,
584 S.E.2d 398 (S.C. Ct. App. 2003)......................................................45

*Harrell v. Pineland Plantation, Ltd.*,
523 S.E.2d 766 (S.C. 1999) ........................................20,36,43,46,57,60

*Johnson v. Jackson*,
735 S.E.2d 664 (S.C. Ct. App. 2012)...............................................35,44

*Keene v. CNA Holdings, LLC*,
870 S.E.2d 156 (S.C. 2021) ........................... 16,17,18,21,22,23,31,32,35,36,39,40,
...........................................................................42,48,49,56,59

*Keene v. CNA Holdings, LLC*,
827 S.E.2d 183 (S.C. Ct. App. 2019)......................................................23

*Lewis v. L.B. Dynasty*,
770 S.E.2d 393 (S.C. 2015) ...................................................................36

viii

*Lovelace v. Sherwin-Williams Co.*,
681 F.2d 230 (4th Cir. 1982) ...................................................................32

*Maloney v. Landmark Tours & Travel, Inc.*,
No. 9:10-0725-MBS, 2011 WL 1526731 (D.S.C. April 19, 2011) ..............21,35,43

*Matthews v. E.I. Du Pont De Nemours and Company,*
No. 4:16-cv-02934-RBH, 2018 WL 5978111 (D.S.C. Nov. 13, 2018)..................58

*McKinney v. Johnson*,
No. 2:09-1353-JFA-RSC, 2010 WL 3463118 (D.S.C. June 30, 2010) ..................32

*Miles v. Delta Well Surveying Corp.*,
777 F.2d 1069 (5th Cir. 1985) .................................................................41

*Muth v. United States*,
1 F.3d 246 (4th Cir. 1993) ......................................................................20

*Nader v. Blair*,
549 F.3d 953 (4th Cir. 2008) ...................................................................16

*Olmstead v. Shakespeare,*
581 S.E.2d 483 (S.C. 2003) ............................................21,23,33,34,40,42

*Ost v. Integrated Prod., Inc.*,
371 S.E.2d 796 (S.C. 1988) ..............................................................23, 51

*Parker v. Gen. Servs. Admin.*,
684 F.Supp. 239 (E.D. Mo. 1988)..............................................................41

*Parker v. Williams & Madjanik, Inc.*,
267 S.E.2d 524 (S.C. 1980) ...............................................................43,44

*Philips v. Pitt Cnty. Mem. Hosp.*,
572 F.3d 176 (4th Cir. 2009) ...................................................................47

*Poch v. Bayshore Concrete Prods./S.C., Inc.*,
747 S.E.2d 757 (S.C. 2013) .............................................. 14,15,19,20,21,34,40,42,
.................................................................43,44,45,49,51,59

ix

*Posey v. Proper Mold Eng'g, Inc.*,
661 S.E.2d 395 (S.C. Ct. App. 2008).........................................19,20,22,35,45,59,60

*Provau v. YRC, Inc.*,
No. 4:16-cv-00422-RBH, 2017 WL 1541880 (D.S.C. Apr. 28, 2017) ...................55

*Randolph v. Eastman Chem. Co.*,
180 S.W.3d 552 (Tenn. Ct. App. 2005)....................................................................41

*Riden v. Kemet Elecs. Corp.*,
437 S.E.2d 156 (S.C. Ct. App. 1993)........................................................19,37,40,45

*Rowland v. Am. Gen. Fin., Inc.*,
340 F.3d 187 (4th Cir. 2003) ....................................................................................30

*Smith v. Bush*,
No. 8:17-2775-MGL-JDA, 2017 WL 5900088
(D.S.C. Nov. 13, 2017) .............................................................................................47

*Smith v. Lincoln Mem'l Univ.*,
304 S.W.2d 70 (Tenn. 1957)....................................................................................41

*Smith v. T.H. Snipes & Sons, Inc.*,
411 S.E.2d 439 (S.C. 1991) .................................................................................44,45

*Sullen v. Mo. Pac. R.R. Co.*,
750 F.2d 428 (5th Cir. 1985) ...................................................................................41

*United States v. Armour & Co.*,
402 U.S. 673 (1971).................................................................................................15

*United States v. Hernandez*,
166 F.3d 335 (Table), 1998 WL 841504 (4th Cir. Dec. 7, 1998)...........................31

*United States v. Johnson*,
726 F.2d 1018 (4th Cir. 1984) .................................................................................56

*Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*,
510 F.3d 474 (4th Cir. 2007) ...................................................................................20

x

*Wilson v. Daniel Int'l Corp.*,
197 S.E.2d 686 (S.C. 1973) ....................................................................37

*Woods v. Carpet Restorations, Inc.*,
611 So.2d 1303 (Fla. Dist. Ct. App. 1992) ...........................................41

*Worsham v. Accts. Receivable Mgmt., Inc.*,
497 F. App'x 274 (4th Cir. 2012) ..........................................................19

*Zeigler v. Eastman Chem. Co.*,
54 F.4th 187 (4th Cir. 2022) .................. 17,18,19,21,22,23,24,31,32,35,36,39,40,48

## **Statutes**

29 C.F.R. § 1910.141(a)(3)(i) ................................................................41

29 C.F.R. § 1910.141(a)(4)(ii) ...............................................................41

S.C. Code Ann. § 41-15-220....................................................................41

S.C. Code Ann. § 42-1-10........................................................................16

S.C. Code Ann. § 42-1-400.............................................1,16,19,22,34,35,50

S.C. Code Ann. § 42-1-540..........................................................1,16,19

S.C. Code Ann. § 42-1-610........................................................................36

S.C. Code Ann. § 42-5-10............................................................1,16,19

S.C. Code Ann. Regs. 71-108 ...................................................................41

## **Rules**

Fed. R. Civ. P. 59(e)..............................................................................20

Fed. R. Evid. 902(5)................................................................................47

Fed. R. Evid. 801(d)(2)(D) ........................................................................8

## **Other**

Collins Dictionary, 2023 ........................................................33

Combustible Dust in Industry: Preventing and Mitigating
the Effects of Fire and Explosions, Safety and Health
Information Bulletin 07-31-2005, U.S. Dep't of Labor .......................................47

Dictionary.com, 2023...........................................................31,33

Lex K. Larson et al., *Larson's*
*Workers' Compensation Law* § 70.06 (2022).........................................41

Macmillan Dictionary, 2023 ...................................................31

Merriam-Webster, 2023 .........................................................31,33

Oxford Learner's Dictionaries, 2023 .......................................32

## <u>STATEMENT OF ISSUES</u>

1.      Was the District Court correct in granting Defendants' Motions to dismiss on the grounds that Plaintiffs were statutory employees of Innovative Fibers LLC ("Innovative") under S.C. Code Ann. § 42-1-400 at the time of Plaintiffs' injury on November 1, 2021 and are barred from suing Defendants by the exclusivity provisions, S.C. Code Ann. §§ 42-1-540 and 42-5-10, in The South Carolina Workers' Compensation Law?

## STATEMENT OF THE CASE

This appeal arises from a dust flash fire on November 1, 2021, at a facility operated by Innovative at 185 Littlejohn Street in Spartanburg, South Carolina (the "Plant"). (JA0045; JA0052; JA0060). At the time of the flash fire, Plaintiffs Parker O'Neil Wideman ("Wideman"), Riley C. Draper ("Draper"), and William F. Douglass ("Douglass") (collectively, "Plaintiffs")[1] were directly employed by Advanced Environmental Options, Inc. ("AEO"). (JA0044; JA0051; JA0059). The Complaints allege that, in the process of cleaning by sweeping and vacuuming waste particles and dust, Plaintiffs created a dust cloud that was ignited by a natural gas-fed flame on one of the oven dryers/crystallizers in the crystallizer room.[2] (JA0046; JA0053; JA0061). A camera system in the crystallizer room videotaped Plaintiffs cleaning on November 1, 2021, and the flash fire.[3] (JA0201-0202; JA0293;

---

[1] Consistent with the District Court's Order (JA1065), Plaintiffs who were cleaning at the time of the flash fire will be referred to in Defendants' Brief collectively as Plaintiffs and Plaintiff Jessica L. Douglass will be referred to by her name.

[2] The record describes the room where Plaintiffs were cleaning as the crystallizer room or the oven dryer room. Defendants' Brief uses the term "crystallizer room."

[3] Defendants have video footage from October 25, 2021 through November 5, 2021. (JA0309-0311). Initially, Defendants preserved video of the flash fire on November 1, 2021. (JA0293; JA0309-0311). In March 2022, Defendants learned that prior cleaning by Innovative employees was potentially relevant but, by that time, the camera system had recorded over footage before October 25, 2021. (JA0293; JA0309-0311).

JA1237).

## I.     Innovative's business and manufacturing process.

Innovative is in the business of taking recycled plastic (recycled or granulated Polyethylene Terephthalate ("PET")) and converting the PET into polyester fibers. (JA0194).  The fibers are used as fill materials in applications such as pet beds, outdoor furniture, mattresses, other home furnishings and in the automotive industry. (JA0194).  The manufacturing process generally involves taking granulated PET, melting it with heat and extruding it into polyester fibers.  (JA0194).  A critical and integral part of the manufacturing process is drying the PET to remove moisture. (JA0194).  If the PET is not properly dried, moisture in the PET will cause defects and other problems during the extrusion process.  (JA0194).

The manufacturing process includes the use of two oven dryers or "crystallizers" that crystalize the PET for further drying prior to extrusion.  (JA0194-0195).  Crystallization is an important and necessary part of the manufacturing process that causes a barrier to form on the outside of the PET material, which then prevents the material from starting an exothermic reaction (self-heating) when the PET goes through the remainder of the drying process.  (JA0194-0195).  The crystallizers currently used at the Plant are called the "H Line" and the "J Line." (JA0195).  Below is an undisputed diagram from the South Carolina Occupational Safety and Health Administration ("SCOSHA") showing the crystallizers and the

3

crystallizer room:



(JA0837).  As the diagram shows, the crystallizer room is approximately 53 feet wide and 33 feet high.  (JA0837).  Because the cameras in the crystallizer room are located on the wall at the top of the above diagram, the various videos in the Joint Appendix show the crystallizers in opposite order from the diagram, with the J Line crystallizer on the left and the H Line crystallizer on the right in the videos.  (JA1218-1237).

PET material is moved through each crystallizer on a conveyor that periodically stops for hot air, heated by a natural gas-fed fire, to blow across the stationary PET and crystallize the outside surface.  (JA0195).  After crystallization, the conveyor moves the PET out of each crystallizer.[4]  (JA0195; JA1218).

---

[4]  A March 15, 2022 video in the Joint Appendix demonstrates the crystallization process.  (JA0195; JA1218).  The video shows the crystalized PET being discharged from the J Line crystallizer.

4

Prior to June 2020, crystallization of PET material at the Plant was performed by drum dryers. (JA0195-0196). In June 2020, Innovative purchased the two current crystallizers used and had them installed at the Plant. (JA0196). Innovative was aware the crystallizers would create PET particle and dust buildup underneath the crystallizers that would need to be cleaned up. (JA0196). The current crystallizers were installed on elevated platforms to allow ease of access for Innovative employees to clean underneath. (JA0196).

Below is an undisputed diagram from SCOSHA, showing the platform heights in the crystallizer room using the J Line crystallizer as an example:



(JA0839). Both the H Line and J Line crystallizers have four elevated levels above a concrete floor ("Floor Level" on the above diagram). The J Line crystallizer is shown in the photograph below:

5



(JA0843; JA0406-0409).  The H Line crystallizer is shown in the photograph below:



(JA0841; JA0406-0409).

Each crystallizer sits on an elevated platform identified with a blue "A" on the photographs above for the "first platform" on the SCOSHA diagram on page 5 of this Brief. The tops of the crystallizers are identified with a red "B" in the photographs above. Above the crystallizers, there are two platforms around hoppers ("Super Tankers"), one labeled "second platform" on the SCOSHA diagram on page 5, and identified with a green "C" in the photographs above, and the other labeled "third platform" in the SCOSHA diagram on page 5 and identified with a yellow "D" in the photographs above. The second platform (C) on the J Line sits about 148 inches above the first platform (A) and the third platform (D) sits about 64 inches above the second platform (C), making the total distance between the first platform

7

(A) and the third platform (D) about 212 inches (approximately 17½ feet). *See* (JA0839).

According to video of the flash fire (JA1237), Plaintiffs' verified Interrogatory Responses (JA0845-0851), and Plaintiffs' signed statements given to SCOSHA (JA0853-0854), at the time of the flash fire on November 1, 2021, Plaintiffs were working on the following levels in the crystallizer room doing the following:

- Plaintiff Douglass was on the top of the H Line crystallizer (red "B" level of JA0841) shoveling PET waste and dust down to the floor; and

- Plaintiffs Wideman and Draper were on the third platform above the J Line crystallizer ("D" level of JA0843) shoveling or brushing PET waste and dust down to the floor.[5] (JA0845-0851).

---

[5] Plaintiffs' Brief incorrectly claims all Plaintiffs were working above the tops of the crystallizers at the time of the flash fire. For example, Page 17 states that all three Plaintiffs were cleaning "on levels C and D when the explosion happened," citing deposition testimony of Mike Sisk. Sisk was not present in the crystallizer room at the time of the flash fire and was merely testifying as to his "understanding" of Plaintiffs' location. Sisk has no personal knowledge of where Plaintiffs were actually cleaning when the flash fire started. (JA0440-0441; JA0457). At the time of his deposition, Sisk was not employed by either Defendant; therefore, his testimony is not an "opposing party statement" under Fed. R. Evid. 801(d)(2)(D). Plaintiffs were asked a specific Interrogatory about their physical location and what they were doing when the flash fire started on November 1, 2021. (JA0845-0851). Plaintiffs answered under oath that Douglass was cleaning on top of the H Line crystallizer (B level). (JA0845-0851). Plaintiffs never amended these Interrogatory Responses. *See Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 189-90 (4th Cir. 2017) (litigant required to supplement discovery responses). Plaintiffs

8

In the process of shoveling and brushing PET waste and dust down to the concrete floor to be vacuumed by a fourth AEO employee, Plaintiffs created a dust cloud (in violation of an OSHA Information Bulletin on combustible dust), which was ignited by the gas-fed flame in the J Line crystallizer. (JA0880-0884). Plaintiffs were admittedly injured while performing cleaning at the Plant. (JA0045; JA0052-0053; JA0060-0061; JA1065).

## II.     Cleaning at the Plant.

The crystallization process and operation of the crystallizers generate PET dust and particles, both in the crystallizer room and on the machinery, that need to be regularly cleaned. (JA0197). Regular cleaning and periodic heavy cleaning are an important, necessary and integral part of Innovative's business for several reasons. (JA0196-0197). First, the PET particles and dust that are cleaned up are reused in the manufacturing process. (JA0196-0197). At any given time, five-to-ten percent of the PET being run through the manufacturing process consists of PET waste that was cleaned up in the Plant, including PET particles generated by the crystallizers. (JA0196-0197). Second, cleaning is an important and necessary part of Plant operation because PET waste and dust buildup can cause machinery

---

appear to want to confuse Douglass's location because it is undisputed that Innovative employees cleaned on the tops of the crystallizers (B level where Douglass was admittedly cleaning), including twice in the week before the flash fire. (JA0294; JA0904-0906; JA0931-0943; JA0945-0968; JA1224).

malfunction and other problems during the manufacturing process. (JA0196-0197). Third, the manufacturing process inherently produces excessive waste that must be kept under control to prevent unsafe conditions in the Plant, (JA0196-0197), including to prevent a potential fire hazard. (JA0925-0926). A SCOSHA witness testified to the following:

> Q.    And it's an important part of their business, from an OSHA standpoint, that they keep that dust up and clean for the safety of everyone. Correct?
>
> A.    Correct.

(JA0885); *see also* (JA0887-0888). Further, the SCOSHA witness testified that cleaning was required under several SCOSHA regulations, otherwise Innovative would be cited. (JA0885-0888).

The crystallizers currently in use at the Plant have been in operation since June 2020. (JA0198). Other than seven days in 2021, including the day of the flash fire on November 1, 2021, cleaning of the crystallizer room, crystallizers and related machinery was always done by Innovative employees. (JA0193-0194; JA0198); *see also* (JA0969-0974). Innovative employees would regularly and routinely sweep the crystallizer room (including underneath the machines). (JA0197-0198). The material collected would be reused in the manufacturing process. (JA0197-0198). Innovative employees would do a heavy clean of the room and crystallizers approximately every six months. (JA0197-0198). Prior to the installation of a

10

vacuum system, Innovative employees would sweep or shovel the PET waste and dust generated by the crystallizers.  (JA0197-0198).

In 2014 and 2015, Innovative installed machinery in the Plant that moves PET material by air pressure and airflow, called the "Dover MEI."  (JA0200).  ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████  The modifications to the machinery were made to allow Innovative employees to clean more efficiently.[6]  (JA0198-0200).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████

Innovative employees continued to perform cleaning at the Plant after November 1, 2021.  (JA0199-0203; JA0381-0383; JA0543; JA0833; JA0923); *see also* (JA0947-0964).  Cleaning at the Plant (either totally or on some periodic basis) has not been outsourced by Innovative to any third party.  (JA0367-0368; JA0472-0473; JA0548; JA0599-0600; JA0639-0640; JA0924-0925); *see also* (JA0202-

---

[6] ████████████████████████████████████████████████████████████
████████████████  Plaintiffs' counsel conceded to the District Court that the vacuum system was installed for Innovative employees to use themselves, although attempting to distinguish use was for "daily cleaning."  (JA1035).

0203; JA0944-0968; JA0969-0974; JA0976-0984).[7]

## III.    Innovative's contract with AEO, Plaintiffs' direct employer.

Because of COVID-related workforce shortages in 2021, Innovative had to supplement its workforce for cleaning in the Plant.  (JA0193-0194); *see also* (JA0969-0974).   Innovative contracted with AEO to supplement Innovative's workforce and clean in the crystallizer room on November 1, 2021.  (JA0193-0194); *see also* (JA0969-0974).

Prior to November 1, 2021, there had been discussions with AEO about doing monthly cleaning at the Plant.  (JA0202-0203).  However, as of November 1, 2021, Innovative had not made a final decision to engage any third party for monthly cleaning.  (JA0202-0203; JA0383-0384; JA0579; JA0922-0923); *see also* (JA0969-0974; JA1074).  Innovative has never entered into a contract for periodic cleaning with a third-party contractor.  (JA0202-0203; JA0383-0384; JA0922-0923); *see also* (JA0969-0974; JA1074).  Jim Million ("Million"), the AEO witness, testified that

---

[7]  The Joint Appendix includes four exhibits that were presented to the District Court containing excerpts of deposition testimony on the following:

- Plaintiffs were performing work that had previously been, and is still being, performed by Innovative employees (JA0944-0968);
- Plaintiffs were supplementing Innovative's workforce (JA0969-0974);
- There was no agreement with VLS or AEO for quarterly or monthly work (JA0976-0984);
- At the time of Plaintiffs' injuries, Plaintiffs were performing work that was an important and/or necessary, essential and integral part of Innovative's business (JA0985-0994).

12

the cleaning performed by Plaintiffs was a one-time cleaning and there was not, and has never been, an agreement that AEO would do cleaning on a periodic basis. (JA0682-0683; JA0701-0702). The October 14, 2021 email from Chris Shuler ("Shuler"), Innovative's Plant Manager, to Million indicated that Innovative would "get back in touch with [AEO] on setting something up for monthly services." (JA0130; JA0202-0203). Million confirmed in his deposition that Innovative never got back with AEO about monthly cleaning. (JA0701-0703).

In the fall of 2021, it was important for Innovative to clean the Plant for an insurance quote. At that time, Innovative employees were behind on cleaning because of COVID-related work shortages, and equipment problems on the J Line crystallizer which caused PET material to leak onto the concrete floor. (JA0411-0412). For purposes of the insurance quote, the vast majority of cleaning was done by Innovative employees. ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████

For example, Plaintiffs' Brief cites a series of emails in mid-October of 2021 from one of Innovative's owners, Chip Stein, about the need to clean in the crystallizer room. ███████████████████████████████████████

13



Videos and snapshots in the record show Innovative employees cleaning in the crystallizer room during the week before November 1, 2021. (JA0292-0305; JA1224-1236). After VLS left on October 16, 2021, all cleaning for an October 24, 2021 insurance inspection was performed by Innovative employees.[8]

## IV.    Procedural History

Defendants generally agree with the procedural history set forth in Plaintiffs' Brief. Plaintiffs concede that their claims against both Innovative and Stein Fibers Ltd. ("Stein") stand or fall together.[9] (JA1080). Two Complaints contain a single cause of action against Defendants for negligence under South Carolina law. (JA0043-JA0057). The third Complaint includes Plaintiff Jessica L. Douglass as a

---

[8]

[9] *Poch v. Bayshore Concrete Prods./S.C. Inc.*, 747 S.E.2d 757, 763-64 (S.C. 2013) (Workers' Compensation Law bars claims against statutory employer and its alter ego).

Plaintiff, and contains South Carolina common law claims for negligence and loss of consortium.[10]  (JA0058-0066).  On May 10, 2022, Defendants filed Motions to dismiss that specifically alleged "Plaintiffs were statutory employees of Defendants at the time of their injuries on November 1, 2021, and, therefore, Plaintiffs' claims are barred by the South Carolina Workers' Compensation Law."  (JA0189-0190).

Page 17 of Plaintiffs' Brief claims that, "[f]ollowing a period of brief jurisdictional discovery," the District Court held a hearing on Defendants' Motions to dismiss.  Jurisdictional discovery was conducted on Defendants' Motions pursuant to a Consent Order.[11]  (JA0284-0288).  Plaintiffs agreed to the discovery period of 90 days.  Plaintiffs never requested additional time for discovery and never identified any additional discovery that Plaintiffs allegedly needed.  Plaintiffs did

___

[10]  Plaintiffs do not challenge the District Court's finding that, if Plaintiff William F. Douglass was Innovative's statutory employee, Plaintiff Jessica L. Douglass is also barred from bringing a loss of consortium claim against Defendants.  (JA1079-1080); *see Poch*, 747 S.E.2d 757 (affirming dismissal of tort claims of injured worker and his wife).

[11]  *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 463 (4th Cir. 2020) ("As the Supreme Court has explained, consent orders . . . 'are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.'" (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).

15

not oppose the District Court deciding the Motions because additional discovery was allegedly needed.[12]

## SUMMARY OF ARGUMENT

The District Court, which was familiar with South Carolina law and the factual record, correctly concluded that Plaintiffs were statutory employees of Innovative and Stein under S.C. Code Ann. § 42-1-400 of The South Carolina Workers' Compensation Law (the "Law") when Plaintiffs were injured on November 1, 2021, and that Plaintiffs' negligence claims are barred by the exclusivity provisions in S.C. Code Ann. §§ 42-1-540 and 42-5-10.[13]  Under South Carolina law, the determination of whether an injured worker is a statutory employee of a business owner is jurisdictional and a question of law for the Court.  Statutory employment involves a fact-intensive inquiry, with each case decided on its own facts.  South Carolina principles of statutory construction, which are binding on this

---

[12]  *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (party opposing motion must identify specific discovery that party wants to conduct and how proposed discovery is relevant to pending motion); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (party seeking to oppose summary judgment on grounds additional discovery is needed must raise this argument *before* district court rules on motion).

[13]  Plaintiffs' Brief repeatedly uses the term Workers' Compensation "Act." However, S.C. Code Ann. § 42-1-10 states this "title shall be known and cited as 'The South Carolina Workers' Compensation Law.'"  *See also Keene v. CNA Holdings, LLC*, 870 S.E.2d 156, 158 n.4 (S.C. 2021).

16

Court, require that *any doubts* as to the injured worker's status be resolved in favor of the worker being a statutory employee of the business owner.

The determination of statutory employment focuses on the activity or tasks Plaintiffs were performing at the time of the flash fire and their initial injury. Here, it is undisputed that Plaintiffs were injured on November 1, 2021, while cleaning PET waste and dust in the crystallizer room of the Plant. At the time of the flash fire, Plaintiffs were sweeping and shoveling PET dust to be vacuumed by a fourth AEO coworker who has not sued Innovative or Stein.

As required by *Keene*, 870 S.E.2d 156, and *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187 (4th Cir. 2022), the District Court initially examined whether, prior to November 1, 2021, Innovative had "decided" (past tense) to outsource cleaning such that Innovative employees no longer performed cleaning. Unlike *Keene* and *Zeigler*, where the activity or tasks in question had not been performed by the owner's employees for years, if ever, Innovative employees were cleaning up PET waste and dust in the crystallizer room in the months leading up to, the day of and after the flash fire which injured Plaintiffs using the same exact methods as Plaintiffs – sweeping, shoveling and vacuuming. Plaintiffs conceded to the District Court, and in their opening Brief, that Innovative employees were cleaning at the Plant and in the crystallizer room immediately prior to November 1, 2021.

17

There is no admissible evidence in the record that, as of November 1, 2021, Innovative had outsourced or made a final decision to outsource cleaning to a third party such that Innovative employees no longer performed cleaning. There is no admissible evidence that Innovative has ever permanently outsourced cleaning on some periodic basis, e.g. monthly or quarterly. The undisputed evidence in the record is that Plaintiffs were performing cleaning under a one-time contract between AEO and Innovative.

Finding that no business decision had been made by Innovative to totally outsource cleaning, the District Court then applied the three traditional tests for statutory employment, each of which remains a "valid consideration" after *Keene*. Based on the evidence in the record, these three tests, particularly the third test, show that cleaning is part of Innovative's business. Plaintiffs' attempts to distinguish the cleaning performed by Innovative employees from the cleaning performed by Plaintiffs based on physical location of the cleaning, "routine" vs. "heavy" cleaning, the alleged fact that the PET waste cleaned up by Plaintiffs would later be hauled off, or whether the crystallizers were operating during cleaning are irrelevant under South Carolina jurisprudence.

As noted in *Zeigler*, *Keene* did not fundamentally alter South Carolina's statutory employment jurisprudence. 54 F.3d at 199. Three South Carolina appellate court decisions have held that workers performing cleaning-type activities

18

for a business owner were statutory employees of the owner. *See Poch*, 747 S.E.2d at 762; *Fortner v. Thomas M. Evans. Constr. & Dev., LLC*, 741 S.E.2d 538, 543-45 (S.C. Ct. App. 2013); *Riden v. Kemet Elecs. Corp.*, 437 S.E.2d 156 (S.C. Ct. App. 1993).

## **ARGUMENT**

### I.  **Standard of Review**

The task of the District Court was to determine whether the South Carolina Supreme Court would conclude that Plaintiffs were the statutory employees of Innovative under S.C. Code Ann. § 42-1-400 at the time of the flash fire on November 1, 2021. *Zeigler*, 54 F.4th at 194. If Plaintiffs were statutory employees, their tort claims against Innovative and Stein are barred by S.C. Code Ann. §§ 42-1-540 and 42-5-10. *Poch*, 747 S.E.2d at 762-64 (tort claims barred against statutory employer and its alter ego); *Posey v. Proper Mold Eng'g, Inc.*, 661 S.E.2d 395, 402 (S.C. Ct. App. 2008), cited with approval by the South Carolina Supreme Court in *Poch* (exclusivity provisions of the Law prevent statutory employees from bringing tort actions against their direct or statutory employer).[14]

---

[14]  Page 22 of Plaintiffs' Brief correctly notes that the worker's injuries must also arise out of and in the course of employment under the exclusivity provisions in the Law. Plaintiffs' Complaints alleged that they were injured while performing "clean-up work" at the Plant. (JA0044-0045; JA0052-0053; JA0060-0061). *See Worsham v. Accts. Receivable Mgmt., Inc.*, 497 F. App'x 274, 277 (4th Cir. 2012) (party's pleading is a judicial admission by which it is bound through the course of the proceeding). Plaintiffs never argued to the District Court that their injuries did not

Under South Carolina law, the determination of whether a worker is a statutory employee is jurisdictional and a question of law for the Court. *Harrell v. Pineland Plantation, Ltd.*, 523 S.E.2d 766, 769 (S.C. 1999); *Glass v. Dow Chem. Co.*, 482 S.E.2d 49, 51 (S.C. 1997); *Posey*, 661 S.E.2d at 398. "Jurisdictional questions present issues for the determination of the court and not a jury." *Carrier v. Westvaco Corp.*, 806 F.Supp. 1242, 1244-45 (D.S.C. 1992), *aff'd per curiam*, 46 F.3d 1122 (4th Cir. 1995); *see also Bridges v. Wyandotte Worsted Co.,* 132 S.E.2d 18, 22 (S.C. 1963).

When an issue is controlled by state statutory law, federal courts must apply state law principles of statutory construction. *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 482-83 (4th Cir. 2007). It is the policy of South Carolina courts to resolve jurisdictional doubts in favor of including employers and employees under the Law. *Collins v. Charlotte*, 772 S.E.2d 510, 513 (S.C. 2015). "Any doubts" as to an injured worker's status are to be resolved in favor of the worker being considered a statutory employee of the business owner. *Poch*, 747 S.E.2d at 761; *Edens v. Bellini*, 597 S.E.2d 863, 867-68 (S.C. Ct. App. 2004). The any doubts standard applies when the injured worker is seeking

---

arise out of or in the scope of their cleaning activities at the Plant. *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) ("issues raised for the first time on appeal generally will not be considered"). Plaintiffs did not file a Motion under Fed. R. Civ. P. 59(e) arguing the District Court improperly overlooked this issue.

compensation benefits from the owner and also when the owner is using the Law as a "shield" against a tort lawsuit by the injured worker. *Olmstead v. Shakespeare,* 581 S.E.2d 483, 486 (S.C. 2003); *see also Collins*, 772 S.E.2d at 513 (post-*Olmstead* opinion applying construction in favor of including employees under the Law); *Poch*, 747 S.E.2d at 761 (post-*Olmstead* decision applying any doubts standard where business owner was using statutory employment as a shield against tort liability); *Maloney v. Landmark Tours & Travel, Inc.*, No. 9:10-0725-MBS, 2011 WL 1526731, at *1 (D.S.C. Apr. 19, 2011) (same as *Poch*).[15]   In *Keene*, the South Carolina Supreme Court quoted from *Olmstead's* holding on the any doubts standard and stated "[w]e decline again to [adopt a different standard] today."  870 S.E.2d at 162; s*ee also Keene*, 870 S.E.2d at 167 (dissenting opinion).

**II.    The District Court correctly applied *Keene*, *Zeigler* and *Bridges* in light of the facts in the record.**

      **A.    The District Court correctly concluded the facts here are analogous to the South Carolina Supreme Court's decision in *Bridges*.**

Page 24 of Plaintiffs' Brief characterizes *Keene* as a "watershed" opinion. However, as noted in *Zeigler*, "the Court in *Keene* clearly did not view *itself* as fundamentally altering the state's statutory employment jurisprudence."  54 F.3d at 199 (emphasis in original). *Zeigler*'s conclusion on this point is supported by the

---

[15] *Zeigler* describes the South Carolina Supreme Court's 2003 *Olmstead* decision as "*Keene's* immediate predecessor."  54 F.4th at 199.  However, *Poch* was decided after *Olmstead* in 2013.  *Collins* was decided in 2015.

fact the South Carolina Supreme Court recently cited the pre-*Keene* statutory employment decision of *Posey* in the Supreme Court's post-*Keene* decision of *Connelly v. Main Street Am. Grp.*, 886 S.E.2d 196, 200 (S.C. 2023). *Keene* and *Zeigler* stand for the simple proposition that, where the business owner has taken a portion of its business and totally outsourced the activities such that the owner's employees no longer perform those activities, the work is no longer part of the owner's business under S.C. Code Ann. § 42-1-400. That simply did not happen here.

The District Court correctly applied *Keene*, *Zeigler* and South Carolina cases to the factual record including, specifically, the cleaning activities Plaintiffs were performing when the flash fire started on November 1, 2021. (JA1073-1074). The District Court initially focused on whether, prior to November 1, 2021, Innovative decided (past tense) to outsource cleaning work such that Innovative employees were no longer performing cleaning. (JA1072-1078). Because the evidence in the record showed the answer to that question was clearly no, the Court then applied the three traditional tests for statutory employment, each of which remains "a valid consideration" under *Keene,* 870 S.E.2d at 163, and *Zeigler*, 54 F.4th at 196-97. The application of the three tests showed that the cleaning performed by Plaintiffs was part of Innovative's business. The District Court was presented with this question: given the facts in the record, was the cleaning on November 1, 2021, similar to *Keene*

22

and *Zeigler* or to *Bridges*?  (JA1072-1078).  The District Court correctly concluded the facts were similar to *Bridges*, especially considering that any doubts are to be resolved in favor of statutory employment.  (JA1072-1078).

Under South Carolina law, the determination of whether an injured worker was the statutory employee of the owner is a fact-intensive inquiry, with each case decided on its own facts.  *Olmstead*, 581 S.E.2d at 486; *Glass*, 482 S.E.2d at 51; *Ost v. Integrated Prods., Inc.*, 371 S.E.2d 796, 798 (S.C. 1988); *Bridges,* 132 S.E.2d at 23.  The facts here are totally different from the critical facts in *Keene* and *Zeigler*. The *Keene* Court specifically quoted from the underlying Court of Appeals' decision that the case involved "unique facts" and "[o]nly Daniel employees performed maintenance and repairs on the equipment in the Spartanburg plant.  None of the [owner's] employees performed this type of work. . . ."  *Keene*, 870 S.E.2d at 163 (quoting *Keene v. CNA Holdings, LLC*, 827 S.E.2d 183, 193 (S.C. Ct. App. 2019)). Similarly, *Zeigler* noted "Eastman's deliberate and final decision to remove itself from the maintenance business altogether," 54 F.4th at 197, and stressed that "Eastman's choice to outsource its maintenance and repair operations *over a decade ago*, in conjunction with a sale of its facility, was complete, unequivocal, and final." *Id*. at 197-98 (emphasis added).

Unlike *Keene* and *Zeigler*, as of November 1, 2021, Innovative had not made a "complete" and "final" decision to outsource all cleaning to a third party and had

23

not "remove[d] itself from the [cleaning] business altogether." *Id.* at 197; (JA0969-0974; JA0976-0984). Prior to, on the date of and in the days and months after November 1, 2021, Innovative employees cleaned up PET waste and dust in the Plant and, specifically, in the crystallizer room using the same cleaning methods as Plaintiffs – sweeping, shoveling and vacuuming. (JA0382-0383; JA0544; JA0918); *see also* (JA0292-0293; JA0307-0308; JA0944-0968). Innovative provided the District Court with a list of thirty-five current and former employees who had cleaned in the crystallizer room between June 2020, and October 31, 2021. (JA0304-0305). Instead of removing itself from the cleaning business, Innovative modified its material handling system in mid-October 2021, to enable its employees to vacuum up PET waste and dust to clean more efficiently. (JA0198-0200). An Innovative employee used Innovative's vacuum system to clean in the crystallizer room on the morning of November 1, 2021. (JA0201-0202; JA0834-0835).

Contemporaneous emails in Innovative's business records reference cleaning being performed by Innovative employees, including in the crystallizer room, in the months and weeks prior to November 1, 2021:





In each of these instances, the cleaning was performed by Innovative employees using the same cleaning methods as Plaintiffs – sweeping, shoveling and, after October 16, 2021, vacuuming using Innovative's vacuum system. (JA0293).

The record contains undisputed video evidence of Innovative employees cleaning in the crystallizer room between October 26, 2021, and October 31, 2021, including on elevated areas, using the same cleaning methods as Plaintiffs. Below is a snapshot from a video showing an Innovative employee using Innovative's vacuum system on October 26, 2021, to clean on the top of a crystallizer (B level):



(JA0293-0294; JA0845-0851; JA1224). Below are snapshots from videos showing Innovative employees sweeping, shoveling and vacuuming in the crystallizer room from October 27, 2021, through October 31, 2021:



**October 27, 2021**

(JA0293; JA0297; JA1230).



**October 29, 2021**

(JA0200-0201; JA1222-1223).



**October 29, 2021**

(JA0293; JA0300; JA1234).



**October 31, 2021**

(JA0293; JA0301; JA1236).

Below are snapshots of an Innovative employee cleaning on an elevated platform above the J Line crystallizer on October 28, 2021:



Direct Employee 1
Direct Employee 2

(JA0293; JA0298-0299; JA1232).



PET waste and PET dust being cleaned from second and/or third platform levels

(JA0293; JA0298-0299; JA1232).  Plaintiffs conceded to the District Court that Innovative employees performed cleaning up to November 1, 2021, but Plaintiffs tried to distinguish it as "daily cleaning."  (JA1035).

There is no admissible evidence in the record of a contract between Innovative and a third party to perform cleaning on a periodic basis. (JA0969-0974; JA0976-0984). Numerous Innovative employees testified no decision had been made as of November 1, 2021, to outsource periodic cleaning to a third party. (JA0199; JA0367-0368; JA0472-0473; JA0548; JA0599-0600; JA0639-0640; JA0924-0925); *see also* (JA0944-0968; JA0969-0974; JA0976-0984).

The sole evidence offered by Plaintiffs that Innovative had outsourced cleaning on some periodic basis is an unauthenticated October 25, 2021 email supposedly from insurance broker Arthur J. Gallagher ("Gallagher") stating: "[e]ngaging an outside firm to have a complete vacuum of all the dust once a month throughout the facility." Pls.' Br. 7-8; (JA0654). The Innovative employee and Stein employee asked about this email during their depositions denied they wrote the language in question and denied it was true. (JA0367-0368; JA0771-0772); *see also* (JA0976-0984). Plaintiffs never deposed anyone from Gallagher about this email. There is no evidence in the record regarding who made the alleged statement about engaging a firm to do monthly vacuuming, what personal knowledge the author of the email had or whether the person who made the alleged statement had personal knowledge or was authorized to speak on Innovative's behalf. *See Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 194-95 (4th Cir. 2003) (finding letter inadmissible and failing to meet the business records hearsay exception because no

30

one within the company prepared the letter); *United States v. Hernandez*, 166 F.3d

335 (Table), 1998 WL 841504, at *2 (4th Cir. Dec. 7, 1998) (finding phone records

inadmissible and failing to meet a hearsay exception because witness was not

qualified to testify as to the creation and maintenance of the records). ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ is entirely

consistent with the one-time cleaning that Innovative contracted with AEO to

perform on November 1, 2021.  (JA 0769-770; JA0682-0683; JA0701-0702).

  *Keene* required that "the [district] court . . . focus initially on what the owner

*decided* is part of its business," noting that, increasingly, "business managers are

outsourcing work that *formerly was handled* as part of the business. . . ."  870 S.E.2d

at 163 (emphasis added); *see Zeigler*, 54 F.4th at 196-97 (discussing "animating

principal of *Keene*").  The language in *Keene* and *Zeigler* focuses on whether a

business decision had been made and was final at the time the worker was injured.

The word "decided" is the critical part of the initial focus under *Keene* and *Zeigler*.

When used as a verb, the word "decide" means: "to make a choice about what you

are going to do," "to make a decision" (Macmillan Dictionary, 2023); "to make a

final choice or judgment about" (Merriam-Webster, 2023); "to make a judgment or

determine a preference; come to a conclusion" (Dictionary.com, 2023); "to think

31

carefully about the different possibilities that are available and chose one of them" (Oxford Learner's Dictionaries, 2023).

As noted in *Zeigler*, "*Keene* instructs us to 'put value on the business decisions of management' . . . ." *Zeigler*, 54 F.4th at 198. As of November 1, 2021, the business decision that Innovative had made was to use Innovative employees to clean and to supplement Innovative's workforce by occasionally hiring outside contractors to help with cleaning. (JA0367-0368; JA0472; JA0548; JA0599-0600; JA0639-0640; JA0924-0925; JA0969-0974; JA0976-0984). Although there had been internal discussions at Innovative about potentially hiring a third party to clean monthly, it is undisputed that no final decision had been made as of November 1, 2021. (JA0976-0984). Mike Sisk, the former Maintenance Supervisor, who Plaintiffs concede "doesn't have a dog in this fight," (JA1057-1058) specifically testified that no decision to outsource periodic cleaning had been made as of November 1, 2021. (JA0472-0473). As discussed earlier, AEO's witness confirmed this testimony. (JA0701-0704; JA0976-0984). The District Court correctly focused on the actual facts, not what might have happened but did not. *McKinney v. Johnson*, No. 2:09-1353-JFA-RSC, 2010 WL 3463118, at *2 (D.S.C. June 30, 2010) ("The court may not move beyond inference and into the realm of mere conjecture." (citing *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 242 (4th Cir. 1982)).

32

Further, as of November 1, 2021, cleaning was not something that "formerly was handled" by Innovative employees.  When used as an adverb, "formerly" means "previously" (Merriam-Webster, 2023); "in time past" or "in an earlier period" (Dictionary.com, 2023) "something that happened in the past or was true formerly" (Collins Dictionary, 2023).  Innovative employees were cleaning in the crystallizer room before, on November 1, 2021, and after the flash fire using the same cleaning methods as Plaintiffs.

**B.    The District Court correctly focused on the activities or tasks Plaintiffs were performing when the flash fire started.**

Pages 22 and 23 of Plaintiffs' Brief assert that the District Court's focus should have been on the work that AEO contracted to perform for Innovative, rather than what Plaintiffs were doing when the flash fire started.  While some older South Carolina decisions examined the work contracted for, more recent South Carolina appellate court decisions have focused on the activity or tasks the injured worker was performing at the time of their injury.  For example, the District Court correctly cited *Abbott v. The Limited, Inc.*, 526 S.E.2d 513 (S.C. 2000), for the proposition that the three traditional tests for statutory employment focus on "the activity performed by a putative statutory employee."  (JA1070); *see* 526 S.E.2d at 514 ("[i]n determining whether *an employee is engaged in an activity* that is part of the owner's . . . business . . ., this Court has applied three tests. . . ." (emphasis added)).  Page 26 of Plaintiffs' Brief contains a block quote of the three tests from *Olmstead*, 581

33

S.E.2d 483.  However, Plaintiffs conveniently omit the introductory sentence to this block quote, which clearly shows the three tests are applied in the context of what the worker was doing when injured: "In determining whether *an employee is engaged in activity* that is 'part of [the owner's] trade, business or occupation' as required under section 42-1-400, this Court has applied three tests."  581 S.E.2d at 485 (emphasis added).

In *Poch*, a case cited in Plaintiffs' Brief, the Supreme Court again stated that three tests are considered "[i]n determining whether *an employee is engaged in activity* that is 'part of [the owner's] . . . business. . . .'"  747 S.E.2d at 762 (quoting *Olmstead*, 581 S.E.2d at 485) (emphasis added).  The *Poch* Court applied the three tests by focusing on "the work being performed by Poch and Key," the injured workers.  *Id*.  Likewise, in another case cited in Plaintiffs' Brief, *Edens*, 597 S.E.2d 863, the court stated that "[t]hree tests are applied in determining whether *the activity of an employee of a subcontractor* is sufficient to make him a statutory employee within the meaning of § 42-1-400. . . ."  597 S.E.2d at 868 (emphasis added).  The *Edens* court focused on the activity the injured worker was performing "[a]t the time of [the worker's] accident," *Id.*, finding the injured worker's "work on the dye vat project satisfies each of the three criteria which independently show that an employee of a subcontractor is a statutory employee. . . ."  *Id.* at 869; *see also Collins*, 772 S.E.2d at 515 (owner's employees "make similar deliveries as [the injured

34

worker] did if it is within 100 miles of Charlotte"); *Fortner*, 741 S.E.2d at 544, cited with approval by South Carolina Supreme Court in *Collins* (finding third test for statutory employment "was satisfied" where owner's employees pressure-washed houses, "the identical activity performed by Fortner," the injured worker); *Johnson v. Jackson*, 735 S.E.2d 664, 669-70 (S.C. Ct. App. 2012) (focusing on "tasks" performed "at the time of the accident" and determining whether owner's employees "performed the same tasks"); *Posey*, 661 S.E.2d at 402 ("[a]t the time of [the worker's] injury, [he] was helping . . . attach hooks to a plastic injection mold . . .," an activity "routinely performed by [the owner's] employees"); *Maloney*, 2011 WL 1526731, at *2 (focusing on "the activity of [the] worker" at the time of their injury).

## C.     Plaintiffs' definition of "outsourcing" would end statutory employment.

Citing two cases that do not involve statutory employment or South Carolina law, Plaintiffs propose that "outsourcing" occurs anytime the owner obtains goods or services from a third party. Pls.' Br. 31-32. However, this definition would effectively end statutory employment (which *Zeigler*, 54 F.4th at 198-199, clearly says *Keene* did not do) because statutory employment under S.C. Code Ann. § 42-1-400 is *only* implicated when the business owner "contracts with any other person." *See also Zeigler*, 54 F.4th at 195 (statutory employment provision applies when owner "uses an independent contractor" to perform work that is part of owner's

35

business); *Bridges*, 132 S.E.2d at 23 (owner used third party to perform work in question).

While the degree of control and who furnished personal protective equipment ("PPE") is relevant to whether Plaintiffs were independent contractors, *Lewis v. L.B. Dynasty*, 770 S.E.2d 393, 395 (S.C. 2015), it is irrelevant to the issue of statutory employment that Plaintiffs were directly employed by an independent contractor to Innovative. *Bridges*, 132 S.E.2d at 22; *see also Zeigler*, 54 F.4th at 195; *Corollo v. S. S. Kresge Co.*, 456 F.2d 306, 311 (4th Cir. 1972). What AEO and Innovative called their relationship or what was in the contract between AEO and Innovative does not affect statutory employment. *Harrell*, 523 S.E.2d at 770; *Fortner*, 741 S.E.2d at 543; *see also* S.C. Code Ann. § 42-1-610.

The type of outsourcing that precludes statutory employment under *Keene* and *Zeigler* is when the owner totally and unequivocally removes its direct employees from performing the activity in question. As of November 1, 2021, cleaning was not something "formerly done" by Innovative employees. Further, the fact that Plaintiffs and AEO were retained for a discrete, specific task is not controlling. Statutory employment has been found in South Carolina decisions where the independent contractor was hired to perform a specific, discrete project. *See, e.g.*, *Collins*, 772 S.E.2d at 515 ("'express hot delivery' from South Carolina to Wisconsin"); *Bridges*, 132 S.E.2d at 20 (replacement of electric line into textile plant

36

to give owner's employees "a rest"); *Fortner*, 741 S.E.2d at 541 (pressure washing a specific house); *Riden*, 437 S.E.2d 156 (cleaning flammable dust from ducts).

### D. Plaintiffs were cleaning PET waste and dust as part of a cleaning project also being performed by Innovative employees.

Page 29 of Plaintiffs' Brief states, "when a defendant has historically used its own employees to perform work that is part of its business but, to accomplish valid business purposes, decides to supplement those employees with subcontracted labor – not to replace but to assist its direct employees – this is not an outsourcing of work that excludes it from the defendant's business." Similarly, in contrasting *Bridges* with *Wilson v. Daniel Int'l Corp.*, 197 S.E.2d 686 (S.C. 1973), Plaintiffs essentially concede on page 30 of their Brief that statutory employment would apply if the owner is "using the subcontractor to supplement or to assist its own work force on the project in question."[16]

That is exactly what happened here. Plaintiffs' Brief concedes that Innovative made the legitimate business decision to clean the entire Plant for the purposes of getting an insurance quote and for safety reasons. Pls.' Br. 7-10. ███████

---

[16] This alleged distinction still does not resolve any conflict between *Bridges* and *Wilson* because, as discussed *infra*, the owner's employees in *Bridges* were not working with the injured worker on "the project in question" which involved replacement of an electric transmission line. *Wilson* involved injuries to the employee of a material supplier. Plaintiffs were not supplying any materials to Innovative so *Wilson* is not even implicated here. Like the injured worker in *Bridges*, when Plaintiffs were injured, they were providing labor – cleaning – that was also generally performed by Innovative employees.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████     Innovative employees were actively cleaning throughout the Plant and in the crystallizer room, including on top of a crystallizer on October 26, 2021, and on one of the platforms at the C or D level on October 28, 2021. (JA0293-0301; JA0382-0383; JA1224; JA1232); *see also* (JA0947-0964). An Innovative employee was cleaning in the crystallizer room the morning of the flash fire. (JA0201-0202; JA0387; JA0394; JA0834-0835).

**III.   The District Court correctly applied the three traditional tests for statutory employment in light of the facts in the record.**

        **A.   Application of the three tests shows that cleaning was part of Innovative's business.**

Finding that no business decision had been made by Innovative to totally outsource cleaning as of November 1, 2021, the District Court then analyzed the record in light of the three traditional tests for statutory employment under South Carolina law.  (JA01074-1078).  That approach is entirely consistent with the *Keene* Court's discussion of its previous decision in *Bridges*, and *Zeigler*'s discussion of *Bridges* as well.  Referencing *Bridges*, the *Zeigler* Panel stated: "That is not to say, of course, that whether an activity 'has been performed by employees of the owner' – the third of the traditional tests – may never be a 'valid consideration' after *Keene*. . . .  There may well be cases, in other words, in which it is not clear whether an employer has 'defined the scope' of its business, . . . to include certain outsourced work, and whether the outsourced work is regularly performed by the business's own employees, as in *Bridges* – or indeed, any of the three traditional tests – may shed important light on that inquiry."  54 F.4th at 197-98.

The District Court correctly looked to and applied the three traditional tests, each of which remains "a valid consideration" after *Keene*.  Indeed, *Keene* and *Zeigler* both suggest that particular attention should now be paid to the third test: as

39

of November 1, 2021, had Innovative employees performed the same general tasks or activities that Plaintiffs were performing when the flash fire started?

The District Court's Order contains a detailed analysis of the three tests in light of the facts in the record. (JA1074-1078). As noted earlier, "the [South Carolina Supreme] Court in *Keene* did not view *itself* as fundamentally altering the state's statutory employment jurisprudence." *Zeigler*, 54 F.4th at 199 (emphasis in original). In three opinions pre-dating *Keene*, South Carolina appellate courts found that workers performing cleaning activities for a business were statutory employees of the business owner. *Poch*, 747 S.E.2d at 760 (direct employees of temporary agency performing "site cleanup" work for concrete form business); *Fortner*, 741 S.E.2d at 541, cited with approval by Supreme Court in *Collins* (pressure washing house for home construction company); *Riden*, 437 S.E.2d at 157-58 (injured worker cleaning flammable dust from ducts at electronics plant). *Poch* and *Fortner* were decided a decade *after* the South Carolina Supreme Court's decisions in *Abbott*, 526 S.E.2d 513 (S.C. 2000), and *Olmstead*, 581 S.E.2d 483 (S.C. 2003). Defendants submit that *Riden* is factually indistinguishable from the cases on appeal here. Importantly, *Keene* does not purport to overrule or question any of these three cleaning cases.

The South Carolina cleaning decisions are consistent with case law from other states that workers injured while cleaning are statutory employees of the business

40

owner. *See Doane v. E. I. DuPont De Nemours & Co.*, 209 F.2d 921, 923 (4th Cir. 1954); *Miles v. Delta Well Surveying Corp.*, 777 F.2d 1069, 1072 (5th Cir. 1985); *Sullen v. Mo. Pac. R.R. Co.*, 750 F.2d 428, 432 (5th Cir. 1985); *Parker v. Gen. Servs. Admin.*, 684 F.Supp. 239, 241 (E.D. Mo. 1988); *Brack v. CPPI of Ga., Inc.*, 849 S.E.2d 521, 523-24 (Ga. Ct. App. 2020); *Randolph v. Eastman Chem. Co.*, 180 S.W.3d 552, 560-61 (Tenn. Ct. App. 2005); *Woods v. Carpet Restorations, Inc.*, 611 So.2d 1303, 1304 (Fla. Dist. Ct. App. 1992); *Smith v. Lincoln Mem'l Univ.*, 304 S.W.2d 70, 74 (Tenn. 1957); Lex K. Larson et al., *Larson's Workers' Compensation Law* § 70.06 (2022). Moreover, OSHA standards, as adopted by the South Carolina Department of Labor, expressly require cleaning by an employer as part of operating a business. *See* 29 C.F.R. § 1910.141(a)(3)(i), as adopted pursuant to S.C. Code Ann. § 41-15-220 and incorporated by reference pursuant to S.C. Code Ann. Regs. 71-108 and 29 C.F.R. § 1910.141(a)(4)(ii), as adopted pursuant to S.C. Code Ann. § 41-15-220 and incorporated by reference pursuant to S.C. Code Ann. Regs. 71-108. (JA0885-0888; JA0988-0994).

**B. Plaintiffs' proposed "statutory employment analysis" is contrary to the required construction in favor of statutory employment and South Carolina appellate court decisions.**

Plaintiffs' Brief repeatedly suggests that the three traditional tests only apply in the context of an additional question – what is the defendant's business and is the activity part of that business? Pls.' Br. 34-35. However, as made clear by *Collins*,

*Poch* and *Olmstead*, the three tests determine what is "part of" the owner's business. If one of the tests is met, then the activity is part of the owner's business and the injured worker is the owner's statutory employee. *Collins*, 772 S.E.2d at 513-14; *Poch*, 747 S.E.2d at 762; *Olmstead*, 581 S.E.2d at 485.

Plaintiffs also argue that, after *Keene*, the three tests for statutory employment are now reduced to only considerations. Pls.' Br. 32-33. In *Keene*, the Court continued to refer to the traditional tests as "tests," stating "each *test* remains a valid consideration." 870 S.E.2d at 163 (emphasis added). Further, prior to *Keene*, the South Carolina appellate courts used the verb "consider" in the context of the three tests. *See, e.g., Collins*, 772 S.E.2d at 514 ("Court *must* consider" three tests) (emphasis in original); *Fortner*, 741 S.E.2d at 544 ("[c]ourt must consider" three tests). *Keene*'s use of the noun "consideration", when saying "each test remains a valid consideration", is not surprising given that the Supreme Court had used the verb "consider" when referring to the three tests in *Collins*, its most recent statutory employment opinion before *Keene*.

After spending several pages discussing various South Carolina cases on statutory employment, Plaintiffs propose on pages 34 and 35 of their Brief a new multi-step "statutory employment analysis" which has never been adopted by the South Carolina courts, and which is contrary to existing South Carolina case law.[17]

_____

[17]  Plaintiffs never proposed this multi-step "analysis" to the District Court.

First, this new, complex analysis (with multiple impediments to statutory employment) is contrary to South Carolina case law that requires a construction in favor of including workers under the Law, resolving any doubts in favor of statutory employment. *Collins*, 772 S.E.2d at 513; *Poch*, 747 S.E.2d at 761. While statutory employment provides a defense for the owner in a civil tort lawsuit, it also provides the injured worker with the means to recover "swift and sure" compensation benefits from the owner when the injured worker's direct employer does not have workers' compensation insurance. Here, Plaintiffs had the benefit of "double protection" under the Law because both their direct employer, AEO, and Innovative had workers' compensation coverage in place to cover Plaintiffs for work-related injuries. (JA0208-0211; JA1078-1079);[18] *Harrell*, 523 S.E.2d at 774; *Parker v. Williams & Madjanik, Inc.*, 267 S.E.2d 524, 528 (S.C. 1980); *Maloney*, 2011 WL 1526731, at *1 n.2. However, in a future industrial accident with "catastrophic injuries" arising from cleaning, where the injured worker's direct employer does not have workers' compensation insurance, Plaintiffs' restrictive "analysis" for statutory employment would deny the injured worker the "swift and sure" remedy of compensation benefits from the business owner. *Harrell*, 523 S.E.2d at 773

---

[18] Plaintiffs' Brief does not challenge the District Court's finding that Innovative had workers' compensation insurance coverage for statutory employees on November 1, 2021. *See also* (JA0208-0283; JA1005-1006).

43

(statutory employment "protect[s] employees of direct employers who are financially irresponsible"); *Parker*, 267 S.E.2d at 526 (noting this "approach to workmen's compensation has worked to the advantage of society as well as the employee and employer."). The injured worker will be left with the uncertainties of a civil lawsuit.[19]

Second, many steps in Plaintiffs' multi-part analysis are contrary to South Carolina case law. For example, Plaintiffs propose an examination of the owner's "basic operation" and "primary business." However, South Carolina courts have found statutory employment on multiple occasions where the injured worker's direct employer and the owner were in totally different businesses and the injured worker was performing services ancillary to the owner's primary business. *See, e.g., Poch*, 747 S.E.2d at 760 ("temporary laborers to assist in the site cleanup and equipment dismantling" of business selling concrete forms); *Smith v. T.H. Snipes & Sons, Inc.*, 411 S.E.2d 439 (S.C. 1991) (repair of a metal shearing machine at a scrap metal company); *Bridges*, 132 S.E.2d at 19 (employee of electrical contractor replacing electrical lines at textile plant); *Fortner*, 741 S.E.2d at 540-41, cited with approval in *Collins* (pressure-washing house for company that performs "homebuilding 'from the ground up'"); *Johnson v. Jackson*, 735 S.E.2d 664 (S.C. Ct. App. 2012)

---

[19] Examples of South Carolina appellate court opinions where the injured worker used statutory employment to recover workers' compensation benefits from the owner include *Collins*, 772 S.E.2d 510 and *Fortner*, 741 S.E.2d 538.

44

(temporary employee packaging and loading equipment); *Posey*, 661 S.E.2d at 398-401, cited with approval in *Poch* and *Connelly* (injured worker who drove truck for transport company "attaching hooks to molds" for "manufacturer of plastic injection products"); *Hancock v. Wal-Mart Stores, Inc.,* 584 S.E.2d 398 (S.C. Ct. App. 2003) (assembling merchandise in retail store); *Chew v. Newsome Chevrolet, Inc.*, 431 S.E.2d 631 (S.C. Ct. App. 1993) (security guard at car lot); *Riden*, 437 S.E.2d at 158-59 (duct cleaning for electronics manufacturer).

Similarly, Plaintiffs' "analysis" tries to add onto the third test a requirement that the injured worker must perform the activity "alongside and assisted by" the owner's employees. Although the South Carolina Supreme Court could easily state the third test for statutory employment as "was the injured worker performing the activity alongside and assisted by the owner's employees," the Court has never done so. In some opinions, like *Poch* and *Edens*, the appellate courts have discussed the fact that the worker was injured while working with the owner's employees. However, the finding of statutory employment did not turn on that fact. Moreover, there are numerous other South Carolina decisions where statutory employment was found when the injured employee was not working alongside the owner's employees but was merely performing activities or tasks previously performed by the owner's employees. *See, e.g., Collins*, 772 S.E.2d 510; *Smith*, 411 S.E.2d 439; *Bridges*, 132 S.E.2d at 20; *Fortner*, 741 S.E.2d 538; *Riden*, 437 S.E.2d 156.

Finally, Plaintiffs propose on page 35 of their Brief that the analysis for statutory employment should include an examination of whether the injuries arise out of and in the scope of employment. However, as *Harrell* makes clear, the questions of "out of and in scope of employment" go to the exclusivity provisions in the Law and only apply after "the determination [has been] made that there is a statutory employment relationship. . . ." 523 S.E.2d at 771.

Page 36 of Plaintiffs' Brief argues that statutory employment does not apply here because AEO was hired for a specialized task limited to a specific area of the Plant. The cleaning Plaintiffs were performing was of no different skillset or job function than the cleaning Innovative employees had performed on multiple occasions in the same crystallizer room – sweeping, shoveling and vacuuming. There is no evidence in the record that Plaintiffs had specialized training in cleaning dust or in safety procedures related to dust. The elevated platform where Wideman and Draper were cleaning was no more than 17½ feet above the crystallizers and, as the photographs and videos show, was accessible by stairs and guarded with rails. (JA0298; JA0363; JA0610-0611; JA0841; JA0843; JA1232). No special skills or equipment were required to access the platforms. Innovative had its own scissor-lift that was capable of reaching elevated areas in the crystallizer room. (JA0815; JA0832-0833). Plaintiffs' lack of any special expertise is demonstrated by the fact that the cleaning methods used by Plaintiffs created a dust cloud around a source of

46

ignition in violation of both a 2005 OSHA Information Bulletin on Combustible Dust (JA0880-0881; JA0883-0884), and a safety data sheet on PET in AEO's files which warned that "[c]leaning procedures" should "[a]void producing dust clouds." (JA0676-0679; JA0696; JA0880-0881; JA0883-0884; JA0999-1003); *see also* Combustible Dust in Industry: Preventing and Mitigating the Effects of Fire and Explosions, Safety and Health Information Bulletin 07-31-2005 at 5, U.S. DEP'T OF LABOR, *available at* https://www.osha.gov/sites/default/files/publications/shib073 105.pdf (last visited June 26, 2023).[20]

Plaintiffs also try to assert that the cleaning was specialized and different because AEO would be providing PPE and a vacuum system. Pls.' Br. 37. The video from the morning of November 1, 2021, shows Plaintiffs wearing nothing more than basic PPE, such as face masks and safety glasses, and that the AEO vacuum system was used solely to vacuum on the floor of the crystallizer room. (JA1237); *compare* (JA0293-0294; JA0300; JA0387; JA1224; JA1234) (videos and snapshots of Innovative employees wearing face masks and safety glasses).

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[20] *See* Fed. R. Evid. 902(5) (government publications are self-authenticating); *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (courts may take judicial notice of matters of public record); *Smith v. Bush*, No. 8:17-2775-MGL-JDA, 2017 WL 5900088, at *2 n.1 (D.S.C. Nov. 13, 2017) (collecting cases indicating federal courts may take judicial notice of governmental websites).

Innovative had sufficient hose such that its vacuum system could reach all platforms in the crystallizer room.  (JA0201-0202; JA0536).

Importantly, under the restrictive "analysis" that Plaintiffs have cobbled together taking isolated facts and holdings from South Carolina opinions out of context, the injured worker in *Bridges* would not be the statutory employee of the owner even though *Keene* and *Zeigler* both use *Bridges* as an example of statutory employment.  In *Bridges*, the owner was a textile mill which manufactured woolen goods and the injured worker was directly employed by Collins, an electric contractor, a totally different business.  132 S.E.2d at 19-20.  The activity involved replacing an electric transmission line, which was ancillary to the owner's "basic operation" or "primary business" of manufacturing wool goods.  *Id.*; Pls.' Br. 34-35.  The work in *Bridges* was for a specific project in a specific area of the plant which required specialized skills, certainly more specialized skills than the cleaning services Plaintiffs were providing to Innovative on November 1, 2021.  132 S.E.2d at 19-20.  In *Bridges*, the Collins' employees were working by themselves and not "alongside and assisted by" the owner's employees.  *Id.*; Pls.' Br. 35.  None of the owner's employees were working on replacing the transmission line because the owner's employees had already worked an "excessive amount of overtime," and the whole purpose of using Collins to do the work was so the owner's employees could "have a rest on the particular Sunday selected to replace the line. . . ."  132 S.E.2d at

48

19-20. Collins' employees had performed electrical work at this plant on two prior occasions; thus, their outside help was not an isolated, "one occasion." *Id.*; Pls.' Br. 28. *Bridges* held the fact that the owner used Collins two other times before the worker's injury, and six times after the injury, was not probative of whether the owner's employees also performed electrical work. 132 S.E.2d at 24; *see also Collins*, 772 S.E.2d at 512 (injured worker's employer engaged in business with the owner "roughly two to three times per month").

C.    **Plaintiffs' attempts to distinguish their cleaning on November 1, 2021, from the cleaning performed by Innovative employees are not supported by the facts in the record or South Carolina appellate court decisions.**

Pages 43 to 47 of Plaintiffs' Brief focus on the third test for statutory employment. The third test, even as quoted on page 26 of Plaintiffs' Brief, is very simple: has the activity the worker was performing when injured been previously performed by the owner's employees? If the activity meets this test, then the activity is part of the owner's business. *Collins*, 772 S.E.2d at 514; *Poch*, 747 S.E.2d at 762. South Carolina courts look at the general nature of the activity being performed. *Keene*, 870 S.E.2d at 163 ("[o]nly Daniel employees performed maintenance and repairs on the equipment in the Spartanburg plant. None of the [owner's] employees performed this type of work."); *Collins*, 772 S.E.2d at 515 ("nature of the work for [owner's] direct employees is the same as the work performed by [the injured worker]"); *Poch*, 747 S.E.2d at 762; *Glass*, 482 S.E.2d at 52 (in case involving

49

removal of panels, Court focused on whether owner's employees had performed "construction work").

Regardless of whether the focus is on the activity called for in the contract between Innovative and AEO (cleaning the tops of and above the crystallizers) or the tasks or activities Plaintiffs were performing at the time of the flash fire (sweeping, shoveling and vacuuming), Innovative employees had previously performed the activity on multiple occasions, including cleaning on top of the crystallizers and on an elevated platform in the week before the flash fire. (JA0291-0308). To avoid these facts, Plaintiffs try to graft onto the third test new requirements that do not appear in the case law, or try to draw minor distinctions between the tasks that Plaintiffs were performing and the cleaning by Innovative employees that are irrelevant under South Carolina case law. In attempting to exclude themselves from S.C. Code Ann. § 42-1-400 by latching onto any minor distinction between the cleaning Plaintiffs were performing versus cleaning by Innovative employees, rather than a construction in favor of including workers under the Law, Plaintiffs ask this Court to create a highly restrictive test or "consideration" that the owner's employees must have performed: the same activity, as part of the owner's normal business operations, at the same location in terms of height, with the same intensity, in the same detail, under the same operating conditions and with the exact same equipment as the injured worker.

50

First, on page 45 of their Brief, Plaintiffs return to their argument about specialization and try to add to the third test whether the work contracted for was "discrete, limited, major and specialized." However, an examination of *Glass*, shows specialization etc. is relevant to the first test and has no application to the third test. 482 S.E.2d at 51-52. In *Glass*, the Supreme Court found the third test was not met because the owner did not have employees who did "construction work." *Id.* The videos in the record alone demonstrate Innovative employees could and were doing cleaning using the same methods as Plaintiffs. Further, in *Bridges*, which *Ost*, 371 S.E.2d at 798-99, cites as the historical basis for the third test, the activity was clearly "discrete, limited, major and specialized," involving replacement of an electric transmission line, yet the injured worker was found to be the owner's statutory employee.

Similarly, Plaintiffs try to add a requirement that the work being performed by the injured employee must have been performed by the owner's employees "as part of [the owner's] basic operation." Pls.' Br. 34-35. No South Carolina case has ever imposed this requirement for the third test. The third test is simple – has the activity been previously performed by the owner's employees? If it has, then the activity is deemed part of the owner's business. *See Collins*, 772 S.E.2d at 515; *Poch*, 747 S.E.2d at 762; *Glass*, 482 S.E.2d at 52; *Bridges*, 132 S.E.2d at 23-24.

Plaintiffs try to draw a distinction between their cleaning and cleaning by Innovative employees based on the physical location of the cleaning. This distinction is irrelevant under South Carolina law.[21] First, there is undisputed evidence in the record that Innovative employees cleaned on all levels in the crystallizer room, including the C and D levels:

- Chris Clark, an Innovative maintenance employee, testified that he cleaned PET waste and dust in the crystallizer room on the floor, the top of the crystallizers and the elevated platforms above the crystallizers. (JA0826-0835).

- Mike Sisk, a former Maintenance Supervisor, who has no interest in this matter, confirmed that Innovative employees cleaned PET waste and dust from all elevated areas in the crystallizer room, including the tops of equipment, beams, wall beams and outside the crystallizer room. (JA0476-0488). Sisk testified that Innovative employees had cleaned on the B level at least two times and on the C and D levels at least once after the current crystallizers were installed. (JA0408-0409).[22]

- Robert Taylor ("Taylor"), a Stein employee, testified he had seen Innovative employees cleaning on all elevated platforms in the crystallizer room. (JA0361-0366; JA0381-0383).

---

[21] Plaintiffs' counsel conceded to the District Court that the focus should be on the activity Plaintiffs were engaged in at the time of injury. (JA1037-1041).

[22] In *Bridges*, the Supreme Court noted that the transmission line had previously been replaced once (presumably by the owner's employees) and that the owner's employees otherwise performed electrical maintenance in other areas of the facility. 132 S.E.2d at 23. Here, the facts are similar.

The videos in the record show Innovative employees cleaning the week of October 24, 2021, at the same levels as Plaintiffs:[23]

**Innovative Fibers' Employees**



October 28, 2021

**Plaintiffs Wideman and Draper**



November 1, 2021

(JA0293; JA0298-0299; JA1008; JA1232; JA1237).  The snapshot above on the left, taken from JA1232, shows an Innovative employee on October 28, 2021, pushing PET waste and dust from the second and/or third platforms (levels C and/or D) above the J Line crystallizer.  (JA0298-0299; JA1008).  The snapshot above on the right, taken from JA1237, shows Plaintiffs Wideman and Draper pushing PET dust from level D above the J Line crystallizer on November 1, 2021, shortly before the flash fire.  (JA0846; JA1008).

---

[23]  These videos were authenticated in the supplemental affidavit of Chris Shuler, Innovative's Plant Manager.  (JA0291-0302).  *See Catawba Indian Tribe v. State of S.C.*, 978 F.2d 1334, 1342 (4th Cir. 1992) ("ordinarily, officers would have personal knowledge of the acts of their corporation," and thus, personal knowledge requirement for affidavits satisfied).

53

**Innovative Fibers' Employee**

**Plaintiff Douglass**





October 26, 2021

November 1, 2021

(JA0293-0294; JA1009; JA1224; JA1237). The snapshot above on the left, taken from JA1224, shows an Innovative employee on October 26, 2021, cleaning PET waste and dust from the top (level B) of the J Line crystallizer. (JA0294; JA1009; JA1224). The snapshot above on the right, taken from JA1237, shows Douglass who "was standing on top of the crystallizer oven, identified as level 'B'" and "using a shovel to push PET dust down to the floor" on November 1, 2021. (JA0846; JA1009; JA1237).

**Innovative Fibers' Employee**

**AEO Worker who is not a named Plaintiff**





October 31, 2021

November 1, 2021

54

(JA0293; JA1010; JA1236-1237). The snapshot above on the left, taken from JA1236, shows an Innovative employee on October 31, 2021, cleaning PET waste and dust from the floor of the crystallizer room between the J Line and H Line crystallizers using Innovative's vacuum. (JA0301; JA1010; JA1236). The snapshot above on the right, taken from JA1237, shows the fourth AEO employee vacuuming PET waste and dust from the floor of the crystallizer room between the J Line and H Line crystallizers on November 1, 2021. (JA1010; JA1237).

More importantly, even if Innovative employees had never cleaned on the C and D levels, the nature of the activity or tasks, not the precise physical location, determines whether Plaintiffs were statutory employees at the time of Plaintiffs' injuries. There is no South Carolina appellate court opinion which requires that the owner's employees have performed the activity in the same precise physical location as where the worker was working when injured. *See also Provau v. YRC, Inc.*, No. 4:16-cv-00422-RBH, 2017 WL 1541880, at *3 (D.S.C. Apr. 28, 2017) (finding argument "unpersuasive" that owner's employees had not performed the work at facility where plaintiff was injured because owner's employees had performed the work at other facilities).[24]

---

[24] On pages 43 and 44 of their Brief, Plaintiffs misconstrue the District Court's analysis of *Provau*, 2017 WL 1541880. The District Court cited *Provau* simply for the proposition that the nature of the activity is determinative, not the precise physical location. (JA1076-1077). *Provau* is consistent with the Supreme Court decision's in *Collins* on this issue.

55

In the Supreme Court's 2015 *Collins* opinion, its most recent statutory employment decision before *Keene*, the injured worker, Collins, was found to be the statutory employee of Seko Charlotte, a delivery company, while making a delivery and return trip from Spartanburg, South Carolina to Wauwatosa, Wisconsin, about 800 miles away.[25]  The Supreme Court repeatedly focused on the "nature of the work" being performed by Collins, not the work's physical location, and found that the third test was satisfied because "(3) [Seko Charlotte's] drivers make similar deliveries as Collins did if it is within 100 miles of Charlotte."  772 S.E.2d at 515. If the distance of 800 miles between Wauwatosa and Spartanburg, versus "within 100 miles of Charlotte," did not control in *Collins*, the physical location of the work here is certainly irrelevant where two of the Plaintiffs were cleaning PET waste and dust in the same room, less than 17½ feet higher than where Innovative employees regularly cleaned, using the same cleaning methods, *especially where any doubts must be resolved in favor of statutory employment.*

Further, statutes in South Carolina are to be construed to avoid producing an absurd result.  *Duke Energy Corp. v. S.C. Dep't of Rev.*, 782 S.E.2d 590, 592 (S.C. 2016).  The focus on the physical location of the activity suggested by Plaintiffs

---

[25]  *See Collins v. Charlotte*, 732 S.E.2d 630, 631 (S.C. Ct. App. 2012).  The Court can take judicial notice of matters like geographic distances.  *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984).

would produce an absurd result because, when cleaning PET waste and dust on the floor or on the tops of the crystallizers, like Plaintiff Douglass and the fourth AEO worker were admittedly doing on November 1, 2021, JA0845-0851, Plaintiffs would be statutory employees of Innovative, but when cleaning PET waste and dust less than 17½ feet higher in the same room using the same cleaning methods, Plaintiffs Wideman and Draper would not be statutory employees.  In *Harrell*, the South Carolina Supreme Court rejected a similar technical argument by the plaintiff, finding "[i]f the Court adopted Harrell's approach, employees of a subcontractor would constantly move in and out of worker's compensation coverage throughout the workday based on the type of work they were engaged in at that very moment." 523 S.E.2d at 771; *see also id.* at 771 n.3.  Plaintiffs' contention, that the physical location of the work is controlling, would have Plaintiffs constantly moving in and out of statutory employment depending on where they were cleaning at any particular point in time.

Plaintiffs' Brief also tries to draw a distinction between the frequency and volume of cleaning by Innovative employees versus the cleaning being performed by Plaintiffs on November 1, 2021.[26]  The evidence in the record shows Innovative

---

[26]  Other than an alleged statement by Chris Shuler to SCOSHA that "quarterly cleaning was always done by outside contractors," there is no evidence in the record that any independent contractor performed cleaning at the Plant on a monthly, quarterly or other periodic basis.  Shuler denies making this statement to SCOSHA. (JA0977-0984).  Several other Innovative employees testified this alleged statement

employees performed both daily cleaning of PET waste and dust and periodic heavy cleaning in the Plant and in the crystallizer room using the same cleaning methods as Plaintiffs.  *See* (JA0482-0484; JA0500; JA0534-0535; JA0595-0596; JA0732; JA0735; JA0895; JA0914-0916; JA0918-0919); *see also* (JA0944-0975).

However, even accepting Plaintiffs' argument that there were differences in frequency or volume of cleaning between Innovative employees and Plaintiffs, that attempted distinction was rejected in *Matthews v. E. I. Du Pont de Nemours & Co.,* No. 4:16-cv-02934-RBH, 2018 WL 5978111 (D.S.C. Nov. 13, 2018).   Judge Harwell found the fact that the owner's employees did the activity only "on a part-time or infrequent basis" was not controlling because plaintiff "does not point to any case law requiring a company to have employees performing the same jobs at all locations on a full-time basis in order to satisfy the test that the identical activity has previously been performed by the premises owner."  *Id.* at *6.  Likewise, Plaintiffs' Brief cites no such South Carolina case law.  Similarly, there is no South Carolina case which requires that the owner have a crew dedicated exclusively to the activity.

---

is not true and that Innovative employees regularly did heavy or deep cleaning. (JA0383-0384; JA0434-0435; JA0474; JA0510-0511; JA0575-0576; JA0579; JA0778; JA0922-0924); *see also* (JA0977-0984).   Further, even if Innovative employees did not perform quarterly cleaning, Plaintiffs concede Innovative employees performed "daily cleaning." (JA1034-1035).

Plaintiffs also try to distinguish Plaintiffs' activities from the cleaning by Innovative employees on the grounds that Innovative's contract with AEO called for the PET waste to be hauled off site. While the original proposal/contract provided for a disposal fee (JA0125-0127), a subsequent email from AEO indicated "I removed disposal and included Rolloff Service for on site use for the collected PET waste." (JA0130); *see also* (JA0485-0486; JA0686-0689). Moreover, as discussed on pages 33-35 of this Brief, the correct focus is on the activity or tasks Plaintiffs were engaged in at the time of their initial injury. Plaintiffs' "hauling off" argument is foreclosed by the South Carolina Court of Appeals' decision in *Posey* which, as discussed earlier, has been cited twice with approval by the South Carolina Supreme Court: in *Poch,* 747 S.E.2d at 761, and in the post-*Keene* decision of *Connelly,* 886 S.E.2d at 200. In *Posey*, the injured worker was a driver for a transport company that was hired to transport plastic molds and parts for a business which manufactured the molds and performed mold repairs. 661 S.E.2d at 398. In finding statutory employment, the court focused, not on the ultimate hauling and delivery that would have been performed by the injured worker, but instead on the work being performed at the time of the worker's injury, finding the third test was satisfied because, "[a]t the time of [the worker's] injury, he was helping . . . attach hooks to the plastic

59

injection mold, an activity routinely performed by [the owner's] employees." 661 S.E.2d at 402.[27]

Plaintiffs' Complaints allege that, at the time of their injuries, Plaintiffs were engaged solely in cleaning inside the Plant. (JA0045; JA0052; JA0060). Videos of the flash fire and Plaintiffs' sworn Interrogatory Responses show that Plaintiffs were engaged solely in cleaning – sweeping, shoveling and otherwise moving PET dust to be vacuumed – when Plaintiffs ignited the flash fire that caused their injuries. (JA0844-0851; JA0853; JA0856; JA1237). There is no evidence in the record that Plaintiffs were hauling off PET waste at the time of their injuries or that any vehicle which might have later been used to haul off PET waste caused or contributed to the flash fire.

Finally, Plaintiffs try to draw a distinction between their cleaning on the elevated platforms and cleaning on the same levels by Innovative employees on the grounds the crystallizers were turned off when Innovative employees cleaned elevated areas. Plaintiffs cite no South Carolina case which requires that the owner's

---

[27] Page 48 of Plaintiffs' Brief again incorrectly argues that the District Court improperly focused on what Plaintiffs were doing at the time of the flash fire. Citing a block quote from *Harrell*, 523 S.E.2d at 771-772, Plaintiffs argue that what is relevant is whether Plaintiffs' injuries arose out of and in the scope of their employment with AEO. However, this block quote appears in *Harrell* at the end of a paragraph whose start clearly indicates that the issues of course and scope of employment only become relevant "[o]nce the determination is made that there is a statutory employment relationship. . . ." *Id.*

employees perform the same activities under the exact same operating conditions as the injured worker.  The undisputed evidence is that Innovative employees cleaned on the floors and underneath the crystallizers with the crystallizers running using the same cleaning methods as Plaintiffs.  (JA0435; JA0920).  As discussed earlier, the precise physical location or height of the activity is irrelevant under South Carolina law.

## CONCLUSION

For these reasons, the District Court's December 16, 2022 Order granting Defendants' Motions to dismiss should be AFFIRMED.

Respectfully submitted,

/s/ H. Sam Mabry, III
H. Sam Mabry, III (Fed ID #3252)
Jonathan D. Klett (Fed ID #12858)
HAYNSWORTH SINKLER BOYD, P.A.
P.O. Box 2048
Greenville, SC 29602
T: 864.240.3200
smabry@hsblawfirm.com
jklett@hsblawfirm.com

Kevin Lindsay Terrell
THE WARD LAW FIRM PA
P.O. Box 5663
Spartanburg, SC 29304
T: 864.573.8500
lterrell@wardfirm.com

*Counsel for Appellees*

July 3, 2023
Greenville, South Carolina